# WILLARD *v.* TAYLOE.

1. A covenant in a lease giving to the lessee a right or option to purchase the premises leased at any time during the term, is in the nature of a continuing offer to sell. The offer thus made, if under seal, is regarded as made upon sufficient consideration, and therefore one from which the lessor is not at liberty to recede. When accepted by the lessee, a contract of sale is completed.

2. When a contract for the sale of real property is plain and certain in its terms and in its nature, and the circumstances attending its execution is free from objection, it is the usual practice of courts of equity to enforce its specific execution upon the application of the party who has complied with its stipulations on his part, or has seasonably and in good faith offered, and continues ready to comply with them. But it is not the invariable practice. This form of relief is not a matter of absolute right to either party; but a matter resting in the discretion of the court, to be exercised upon a consideration of all the circumstances of each particular case.

3. In general the specific relief will be granted when it is apparent, from a view of all the circumstances of the particular case, that it will subserve the ends of justice; and it will be withheld when, from a like view, it appears that it will produce hardship or injustice to either of the parties.

4. Where specific execution which would work hardship when unconditionally performed, would work equity when decreed on conditions, it will be decreed conditionally.

5 The kind of currency which a party offers in payment of a contract (which, in this case, consisted of notes of the United States, not equivalent at the time to gold or silver), is important, on a bill for specific performance, only in considering the good faith of his conduct. The condition of the currency in April, 1864, and the general use of notes of the United States at that time, repel any imputation of bad faith in tendering such notes instead of coin in satisfaction of a contract.

6 Where a party is entitled to a specific performance of a contract upon the payment of certain sums, and there is uncertainty as to the amount of such sums, he may apply by bill for such specific performance, and submit to the court the question of amount which he should pay.

7. Fluctuations in the value of property contracted for between the date of the contract, and the time when execution of the contract is demanded, where the contract was when made a fair one, and in its attendant circumstances unobjectionable, are not allowed to prevent a specific enforcement of the contract.

8. The general rule is that the parties to the contract are the only proper parties to the suit for its performance. Hence the assignment by the complainant, prior to his bill, of a partial interest in the entire contract is no defence to the bill for such performance.

9. Where a party, prior to filing a bill for specific performance of a contract for the sale of land, had sent to the other side for examination, and in professed purpose of execution of the contract, the draft of a mortgage which he is ready, on a conveyance being made, to execute, it is no defence to the bill, if the defendant have wholly refused to execute a deed, that the draft is not in such a form as respected parties and the term of years which the security had to run, as the vendor was bound to accept, especially where such vendor, in returning the draft, had not stated in what particulars he was dissatisfied with the draft.

10. When parties have reduced their contracts to writing, conversations controlling or changing their stipulations are, in the absence of fraud, no more received in a court of equity than in a court of law.

11. In this case, without expressing an opinion upon the constitutionality of the provision of the act of Congress which makes United States notes a legal tender for private debts, nor whether, if constitutional, the provision is to be limited in its application to contracts made subsequent to the passage of the act, the court refused to decree a conveyance of real estate, on the tender in such notes, where the estate had greatly risen in value, where at the time of the contract gold and silver coin were the only lawful money of the United States, and where it was impossible to suppose that the parties when making their contract—which was eight years before the notes were authorized—contemplated a substitution of such notes (when tendered much depreciated), for coin ; but did decree a specific execution, upon the payment in coin of the price originally agreed on, with interest, in coin also.

APPEAL from the Supreme Court of the District of Columbia.

This was a suit in equity for the specific performance of a contract for the sale of certain real property situated in the city of Washington, in the District of Columbia, and adjoining the hotel owned by the complainant, Willard, and known as Willard's Hotel.

The facts out of which the case arose were as follows :

In April, 1854, the defendant leased to the complainant the property in question, which was generally known in Washington as " The Mansion House," for the period of ten years from the 1st of May following, at the yearly rent of twelve hundred dollars. The lease contained a covenant that the lessee should have the right or option of purchasing the premises, with the buildings and improvements thereon, at any time before the expiration of the lease, for the sum of twenty-two thousand and five hundred dollars, payable as

follows: two thousand dollars in cash, and two thousand dollars, together with the interest on all the deferred instalments, each year thereafter until the whole was paid; the deferred payments to be secured by a deed of trust on the property, and the vendor to execute to the purchaser a warranty deed of the premises, subject to a yearly ground-rent of three hundred and ninety dollars.

At the time of this lease gold and silver, or bank bills convertible on demand into it, were the ordinary money of the country, and the standard of values. In 1861 the rebellion broke out, lasting till 1865. In the interval, owing to the influx of people, property in the metropolis used for hotels greatly increased in value, and as was alleged by Tayloe, who produced what he deemed a record to show the fact, the complainant, Willard, assigned an undivided half of the property which had been leased to him as abovementioned to a brother of his. In December, 1861, the banks throughout the country suspended payments in specie, and in 1862 and 1863, the Federal Government issued some hundred millions of notes, to be used as money, and which Congress declared should be a tender in the payment of debts. Coin soon ceased to circulate generally, and people used, in a great degree, the notes of the government to pay what they owed.

On the 15th of April, 1864, two weeks before the expiration of the period allowed the complainant for his election to purchase—the property having greatly increased in value since 1854, the year in which the lease was made—the complainant addressed a letter to the defendant, inclosing a check, payable to his order, on the Bank of America, in New York, for two thousand dollars, as the amount due on the 1st of May following on the purchase of the property, with a blank receipt for the money, and requesting the defendant to sign and return the receipt, and stating that if it were agreeable to the defendant he would have the deed of the property, and the trust deed to be executed by himself, prepared between that date and the 1st of May. To this letter the defendant, on the same day, replied that he had

no time then to look into the business, and returned the check, expressing a wish to see the complainant for explanations before closing the matter.

On the following morning the complainant called on the defendant and informed him that he had two thousand dollars to make the first payment for the property, and offered the money to him. The money thus offered consisted of notes of the United States, made by act of Congress a legal tender for debts. These the defendant refused to accept, stating that he understood the purchase-money was to be paid in gold, and that gold he would accept, but not the notes, and give the receipt desired. It was admitted that these notes were at the time greatly depreciated in the market below their nominal value.* On repeated occasions subsequently the complainant sent the same amount—two thousand dollars—in these United States notes to the defendant in payment of the cash instalment on the purchase, and as often were they refused by him. On one of these occasions a draft of the deed of conveyance to be executed by the defendant, and a draft of the trust deed to be executed by the complainant, were sent for examination, with the money. This last was prepared for execution by the complainant alone, and contained a provision that he might, if he should elect to do so, pay off the deferred payments at earlier dates than those mentioned in the lease. These deeds were returned by the defendant, accompanied with a letter expressing dissatisfaction at the manner in which he was induced to sign the lease with the clause for the sale of the premises, but stating that as he had signed it he "should have carried the matter out" if the complainant had proffered the amount which he knew he had offered for the property, meaning by this statement, as the court understood it, if he had proffered the amount stipulated in gold. No objection was made to the form of either of the deeds.

---

* Between the 15th of April and May 1st, 1864, one dollar in gold was worth from one dollar and seventy-three cents to one dollar and eighty cents in United States notes.

Soon afterwards the defendant left the city of Washington, with the intention of being absent until after the 1st of May.

On the 29th of April the complainant, finding that the defendant had left the city, and perceiving that the purchase was not about to be completed within the period prescribed by the covenant in the lease, and apprehensive that unless legal proceedings were taken by him to enforce its execution his rights thereunder might be lost, instituted the present suit.

In the bill he set forth the covenant giving him the right or option to purchase the premises; his election to purchase; the notice to the defendant; the repeated efforts made by him to obtain a deed of the property; his offer to pay the amount required as the first instalment of the purchase-money in United States notes, and to execute the trust deed stipulated to secure the deferred payments, and the refusal of the defendant to receive the United States notes and to execute to him a deed of the premises. It also set forth the departure of the defendant from the city of Washington, and his intended absence beyond the 1st of May following, and alleged that the appeal was made to the equitable interposition of the court, lest on the return of the defendant he might refuse to allow the complainant to complete the purchase, and urge as a reason that the time within which it was to be made had passed. The bill concluded with a prayer that the court decree a specific performance of the agreement by the defendant, and the execution of a deed of the premises to the complainant; the latter offering to perform the agreement on his part according to its true intent and meaning.

The bill also stated some facts, which it is unnecessary to detail, tending to show that the acquisition of the property in question was of especial importance to the complainant.

The answer set up that the complainant, even on his own showing, had no case; that there was no proper tender; that even if the complainant once had a right to file a bill in his sole right—the way in which the present bill was filed—he had lost this right by the transfer of the half to his brother; that the complainant had not demanded an execution even

of the contract which he himself set forth, but by the drafts of the trust deed sent to Tayloe, and which was the trust deed of which he contemplated the execution, he proposed to pay, at his own option, the whole purchase-money before the expiration of the ten years, and thus would interfere with the duration of that security and investment in the identical property leased, which had been originally contemplated and provided for; thus subjecting the defendant to risk and expense in making a new investment. The answer concluded with an allegation, that " by the great national acts and events which had occurred when the complainant filed his bill, and which were still influencing all values and interests in the country, such a state of things had arisen and now existed, as according to equity and good conscience ought to prevent a decree for specific performance in this case, upon a demand made on the last day of a term of ten years, even if in strict law (which was denied) the complainant was entitled to make such demand."

Both Tayloe and Willard were examined as witnesses. The former testified, that when the lease was executed he objected to a stipulation for a sale of the premises, and that Willard said it should go for nothing. Willard swore that he had said no such thing.

The court below dismissed the bill, and Willard took the present appeal.

*Messrs. Curtis, Poland, and Howe, for the appellant,* contended, that when Willard, within the prescribed time, notified to the respondent his election to purchase, the contract became complete.

That where a contract for the conveyance of lands was in its nature and circumstances unobjectionable, it was as much a matter *of course* for a court of equity to decree its specific performance, as it was for a court of law to give damages for its breach.

That the money payable by Willard to Tayloe became a debt, as soon as Willard had signified to Tayloe his option to make the purchase, and that being a " debt," it was capable

of being discharged in notes of the United States made a legal tender for debts by the act of Congress; the counsel here going into a learned argument to show that Congress had power under the Constitution to make its notes a valid tender for payment of private debts.

*Messrs. Cox and McPherson, contra,* and in support of the decree below, argued—

That in point of fact the purpose of the arrangement between Tayloe. and Willard, was but to give to Willard, well known as a hotel-keeper in Washington, a control, during ten years, of property adjoining his hotel, in order to prevent competition with it; and that this was presumable from the lease itself, and was made certain by the testimony of Tayloe, who swears that on his objecting to the clause giving the right to purchase, Willard agreed that *it* should " go for nothing."

That the specific performance of contracts was a matter to be regulated pre-eminently by the suggestions of good conscience; that the rebellion, which between 1861 and 1865 brought countless numbers of strangers to Washington, had made a great and unexpected augmentation in the value of property used for hotels; that this might be ground even for rescinding a contract; or if not so, that certainly it was ground for requiring a complainant asking performance to show a most exact compliance with *his* obligations.

That in this case there was no proper tender; that the statutes under which the notes were tendered by Willard to Tayloe—if indeed they were meant to operate on then existing contracts—were unconstitutional; moreover, that they were not so meant to operate, and of course that this contract was without their scope. Independently of which, that payment of the amount to be paid by Willard to entitle himself to a conveyance, was not the payment of a debt, but the performance of a condition.

That the deed of trust tendered by Willard contemplated an execution by himself alone; whereas it ought to have been by himself and his brother, to whom he had conveyed

a half of his interest in the property, and moreover that it changed the dates at which the deferred payments should be made.

*To this it was replied,* that even if the tender in notes was bad, still, since Congress had declared them a good tender, and this court had never yet decided the reverse of such a position, that Willard did nothing wrong in tendering them; especially since he subjected himself to the court's direction, and was ready to tender coin if this court thought that he was bound to do so.

That the contract having been fair when made, each party took the risk of changes in value; and that here when made it was highly advantageous to Tayloe.

That the defence, that the covenant was obtained by some parol assurance that it would not be enforced was not set up in the answer, and was inconsistent with admitted facts, and in all violation of a leading rule of evidence.

That the fact, that the draft of a trust deed sent by Willard to Tayloe did not conform to the contract, could, under the circumstances, have no legal bearing on the case.

That the omission of the name of Willard's brother was unimportant, since only parties to the contract are proper parties to a bill; and a sub-purchaser of an undivided interest in the contract is not a necessary party.

Mr. Justice FIELD, after stating the facts of the case, delivered the opinion of the court, as follows:

The covenant in the lease giving the right or option to purchase the premises was in the nature of a continuing offer to sell. It was a proposition extending through the period of ten years, and being under seal must be regarded as made upon a sufficient consideration, and, therefore, one from which the defendant was not at liberty to recede. When accepted by the complainant by his notice to the defendant, a contract of sale between the parties was completed.* This contract is plain and certain in its terms, and

---

* Boston and Maine Railroad Company *v.* Bartlett, 3 Cushing, 224;

in its nature and in the circumstances attending its execution appears to be free from objection.   The price stipulated for the property was a fair one.   At the time its market value was under fifteen thousand dollars, and a greater increase than one-half in value during the period of ten years could not then have been reasonably anticipated.

When a contract is of this character it is the usual practice of courts of equity to enforce its specific execution upon the application of the party who has complied with its stipulations on his part, or has seasonably and in good faith offered, and continues ready to comply with them.   But it is not the invariable practice.   This form of relief is not a matter of absolute right to either party; it is a matter resting in the discretion of the court, to be exercised upon a consideration of all the circumstances of each particular case.   The jurisdiction, said Lord Erskine,* "is not compulsory upon the court, but the subject of discretion.   The question is not what the court must do, but what it may do under [the] circumstances, either exercising the jurisdiction by granting the specific performance or abstaining from it."

And long previous to him Lord Hardwicke and other eminent equity judges of England had, in a great variety of cases, asserted the same discretionary power of the court. In *Joynes* v. *Statham*,† Lord Hardwicke said: "The constant doctrine of this court is, that it is in their discretion, whether in such a bill they will decree a specific performance or leave the plaintiff to his remedy at law."   And in *Underwood* v. *Hitchcox*‡ the same great judge said, in refusing to enforce a contract: "The rule of equity in carrying agreements into specific performance is well known, and the court is not obliged to decree every agreement entered into, though for valuable consideration, in strictness of law, it depending on the circumstances."

Later jurists, both in England and in the United States, have reiterated the same doctrine.   Chancellor Kent, in *Seymour*

Welchman *v.* Spinks, 5 Law Times, N. S. 385;  Warner *v.* Willington, 3 Drewry, 523;  Old Colony Railroad *v.* Evans, 6 Gray, 25.

   * 12 Vesey, Jr. 332.          † 3 Atkyns, 388.          ‡ 1 Vesey, Sen. 279.

v. *Delancy*,* upon an extended review of the authorities on the subject, declares it to be a settled principle that a specific performance of a contract of sale is not a matter of course, but rests entirely in the discretion of the court upon a view of all the circumstances; and Chancellor Bates, of Delaware, in *Godwin* v. *Collins*, recently decided, upon a very full consideration of the adjudged cases, says, that a patient examination of the whole course of decisions on this subject has left with him " no doubt that, as a matter of judicial history, such a discretion has always been exercised in administering this branch of equity jurisprudence."

It is true the cases cited, in which the discretion of the court is asserted, arose upon contracts in which there existed some inequality or unfairness in the terms, by reason of which injustice would have followed a specific performance. But the same discretion is exercised where the contract is fair in its terms, if its enforcement, from subsequent events, or even from collateral circumstances, would work hardship or injustice to either of the parties.

In the case of the *City of London* v. *Nash*,† the defendant, a lessee, had covenanted to rebuild some houses, but, instead of doing this, he rebuilt only two of them, and repaired the others. On a bill by the city for a specific performance Lord Hardwicke held that the covenant was one which the court could specifically enforce; but said, " the most material objection for the defendant, and which has weight with me, is that the court is not obliged to decree a specific performance, and will not when it would be a hardship, as it would be here upon the defendant to oblige him, after having very largely repaired the houses, to pull them down and rebuild them." In *Faine* v. *Brown*,‡ similar hardship, flowing from the specific execution of a contract, was made the ground for refusing the decree prayed. In that case the defendant was the owner of a small estate, devised to him on condition that if he sold it within twenty-five years one-half of the purchase-money should go to his brother. Having contracted to sell

---

* 6 Johnson's Chancery, 222.   † 1 Vesey, Sen. 12.

‡ Cited in Ramsden v. Hylton, 2 Vesey, Sen. 306.

the property, and refusing to carry out the contract under the pretence that he was intoxicated at the time, a bill was filed to enforce its specific execution, but Lord Hardwicke is reported to have said that, without regard to the other circumstance, the hardship alone of losing half the purchase-money, if the contract was carried into execution, was sufficient to determine the discretion of the court not to interfere, but to leave the parties to the law.

The discretion which may be exercised in this class of cases is not an arbitrary or capricious one, depending upon the mere pleasure of the court, but one which is controlled by the established doctrines and settled principles of equity. No positive rule can be laid down by which the action of the court can be determined in all cases. In general it may be said that the specific relief will be granted when it is apparent, from a view of all the circumstances of the particular case, that it will subserve the ends of justice; and that it will be withheld when, from a like view, it appears that it will produce hardship or injustice to either of the parties. It is not sufficient, as shown by the cases cited, to call forth the equitable interposition of the court, that the legal obligation under the contract to do the specific thing desired may be perfect. It must also appear that the specific enforcement will work no hardship or injustice, for if that result would follow, the court will leave the parties to their remedies at law, unless the granting of the specific relief can be accompanied with conditions which will obviate that result. If that result can be thus obviated, a specific performance will generally in such cases be decreed conditionally. It is the advantage of a court of equity, as observed by Lord Redesdale in *Davis* v. *Hone*,* that it can modify the demands of parties according to justice, and where, as in that case, it would be inequitable, from a change of circumstances, to enforce a contract specifically, it may refuse its decree unless the party will consent to a conscientious modification of the contract, or, what would generally amount to the same thing,

---

* 2 Schoales & Lefroy, 348.

take a decree upon condition of doing or relinquishing certain things to the other party.

In the present case objection is taken to the action of the complainant in offering, in payment of the first instalment stipulated, notes of the United States. It was insisted by the defendant at the time, and it is contended by his counsel now, that the covenant in the lease required payment for the property to be made in gold. The covenant does not in terms specify gold as the currency in which payment is to be made; but gold, it is said, must have been in the contemplation of the parties, as no other currency, except for small amounts, which could be discharged in silver, was at the time recognized by law as a legal tender for private debts.

Although the contract in this case was not completed until the proposition of the defendant was accepted in April, 1864, after the passage of the act of Congress making notes of the United States a legal tender for private debts, yet as the proposition containing the terms of the contract was previously made, the contract itself must be construed as if it had been then concluded to take effect subsequently.

It is not our intention to express any opinion upon the constitutionality of the provision of the act of Congress, which makes the notes of the United States a legal tender for private debts, nor whether, if constitutional, the provision is to be limited in its application to contracts, made subsequent to the passage of the act.* These questions are the subject of special consideration in other cases, and their solution is not required for the determination of the case before us. In the view we take of the case, it is immaterial whether the constitutionality of the provision be affirmed or denied. The relief which the complainant seeks rests, as already stated, in the sound discretion of the court; and, if granted, it may be accompanied with such conditions as will prevent hardship and insure justice to the defendant. The suit itself is an appeal to the equitable jurisdiction of the

---

* See *infra*, Hepburn *v.* Griswold, p. 603.

court, and, in asking what is equitable to himself, the complainant necessarily submits himself to the judgment of the court, to do what it shall adjudge to be equitable to the defendant.

The kind of currency which the complainant offered, is only important in considering the good faith of his conduct. A party does not forfeit his rights to the interposition of a court of equity to enforce a specific performance of a contract, if he seasonably and in good faith offers to comply, and continues ready to comply, with its stipulations on his part, although he may err in estimating the extent of his obligation. It is only in courts of law that literal and exact performance is required. The condition of the currency at the time repels any imputation of bad faith in the action of the complainant. The act of Congress had declared the notes of the United States to be a legal tender for all debts, without, in terms, making any distinction between debts contracted before, and those contracted after its passage. Gold had almost entirely disappeared from circulation. The community at large used the notes of the United States in the discharge of all debts. They constituted, in fact, almost the entire currency of the country in 1864. They were received and paid out by the government; and the validity of the act declaring them a legal tender had been sustained by nearly every State court before which the question had been raised. The defendant, it is true, insisted upon his right to payment in gold, but before the expiration of the period prescribed for the completion of the purchase, he left the city of Washington, and thus cut off the possibility of any other tender than the one made within that period. In the presence of this difficulty, respecting the mode of payment, which could not be obviated, by reason of the absence of the defendant, the complainant filed his bill, in which he states the question which had arisen between them, and invokes the aid of the court in the matter, offering specifically to perform the contract on his part according to its true intent and meaning. He thus placed himself promptly and fairly before the court, expressing a willingness to do whatever it should adjudge he

ought in equity and conscience to do in the execution of the contract.

Nothing further could have been reasonably required of him under the circumstances, even if we should assume that the act of Congress, making the notes of the United States a legal tender, does not apply to debts created before its passage, or, if applicable to such debts, is, to that extent, unconstitutional and void.

In the case of *Chesterman* v. *Mann*,* it was held by the Court of Chancery of England, that where an underlessee had a covenant for the renewal of his lease, upon paying to his lessor a fair proportion of the fines and expenses to which the lessor might be subjected in obtaining a renewal of his own term from the superior landlord, and of any increased rent upon such renewal, and there was a difference between the parties as to the amount to be paid by the underlessee, he might apply for a specific performance of the covenant, and submit to the court the amount to be paid. So here in this case, the complainant applies for a specific performance, and submits the amount to be paid by him to the judgment of the court.

We proceed to consider whether any other circumstances have arisen since the covenant in the lease was made, which renders the enforcement of the contract of sale, subsequently completed between the parties, inequitable. Such circumstances are asserted to have arisen in two particulars; first, in the greatly increased value of the property; and second, in the transfer of a moiety of the complainant's original interest to his brother.

It is true, the property has greatly increased in value since April, 1854. Some increase was anticipated by the parties, for the covenant exacts, in case of the lessee's election to purchase, the payment of one-half more than its then estimated value. If the actual increase has exceeded the estimate then made, that circumstance furnishes no ground for interference with the arrangement of the parties. The ques-

* 9 Hare, 212.

tion, in such cases, always is, was the contract, at the time it was made, a reasonable and fair one? If such were the fact, the parties are considered as having taken upon themselves the risk of subsequent fluctuations in the value of the property, and such fluctuations are not allowed to prevent its specific enforcement.* Here the contract, as already stated, was, when made, a fair one, and in all its attendant circumstances, free from objection. The rent reserved largely exceeded the rent then paid, and the sum stipulated for the property largely exceeded its then market value.

The transfer, by the complainant to his brother, of one-half interest in the lease, assuming now, for the purpose of the argument, that there is, in the record, evidence, which we can notice, of such transfer, in no respect affects the obligation of the defendant, or impairs the right of the complainant to the enforcement of the contract. The brother is no party to the contract, and any partial interest he may have acquired therein, the defendant was not bound to notice. The owners of partial interests in contracts for land, acquired subsequent to their execution, are not necessary parties to bills for their enforcement. The original parties on one side are not to be mixed up in controversies between the parties on the other side, in which they have no concern.

If the entire contract had been assigned to the brother, so that he had become substituted in the place of the complainant, the case would have been different. In that event, the brother might have filed the bill, and insisted upon being treated as representing the vendee. The general rule is, that the parties to the contract are the only proper parties to the suit for its performance, and, except in the case of an assignment of the entire contract, there must be some special circumstances to authorize a departure from the rule.

The court, says Chancellor Cottenham, in *Tasher* v. *Small*,† "assumes jurisdiction in cases of specific performance of

---

* Wells *v.* The Direct London & Portsmouth Railway Company, 9 Hare, 129; Low *v.* Treadwell, 3 Fairfield, 441; Fry on Specific Performance of Contracts, §§ 235 and 252.

† 3 Mylne & Craig, 69.

contracts, because a court of law, giving damages only for the non-performance of the contract, in many cases, does not afford an adequate remedy. But in equity, as well as at law, the contract constitutes the right, and regulates the liabilities of the parties; and the object of both proceedings is to place the party complaining, as nearly as possible, in the same situation as the defendant had agreed that he should be placed in. It is obvious, that persons, strangers to the contract, and, therefore, neither entitled to the rights nor subject to the liabilities which arise out of it, are as much strangers to a proceeding to enforce the execution of it as they are to a proceeding to recover damages for the breach of it."

When the complainant has received his deed from the defendant, the brother may claim from him a conveyance of an interest in the premises, if he have a valid contract for such interest, and enforce such conveyance by suit; but that is a matter with which the defendant has no concern.

It seems that the draft of the trust deed, to secure the deferred payments, sent to the defendant for examination, was prepared for execution by the complainant alone, and contained a stipulation that he might, if he should so elect, pay off the deferred payments at earlier dates than those mentioned in the covenant in the lease; and it is objected to the complainant's right to a specific performance, that the trust deed was not drawn to be executed jointly by him and his brother, and that it contained this stipulation. A short answer to this objection is found in the fact, that the parties had disagreed in relation to the payment to be made, and until the disagreement ceased no deeds were required. It is admitted that the form of the trust deed was not such a one as the defendant was bound to receive, but as it was sent to him for examination, good faith and fair dealing required him to indicate in what particulars it was defective, or with which clauses he was dissatisfied. Whether it was the duty of the complainant or defendant to prepare the trust deed, according to the usage prevailing in Washington, is not entirely clear from the evidence. There is testimony both ways. The

true rule, independent of any usage on the subject, would seem to be that the party who is to execute and deliver a deed should prepare it. It is, however, immaterial for this case, what rule obtains in Washington. Until the purchase-money was accepted, there was no occasion to prepare any instrument for execution. So long as that was refused the preparation of a trust deed was a work of supererogation. Besides, the execution of the trust deed by the complainant was to be simultaneous with the execution of a conveyance by the defendant. The two were to be concurrent acts; and if the complainant was to prepare one of them, the defendant was to prepare the other, and it is not pretended that the defendant acted in the matter at all.

The objection to the trust deed, founded upon the omission of the name of the complainant's brother as a co-grantor, does not merit consideration. All that the defendant had to do was to see that he got a trust deed, as security for the deferred payments, from the party to whom he transferred the title.

The defendant states in his testimony that when the lease was executed he objected to the stipulation for a sale of the premises, and that the defendant told him that it should go for nothing. And it has been argued by counsel that this evidence should control the terms of the covenant. The answer to the position taken is brief and decisive. First, nothing of the kind is averred in the answer; second, the testimony of the defendant in this particular is distinctly contradicted by that of the complainant, and is inconsistent with the attendant circumstances; and third, the evidence is inadmissible. When parties have reduced their contracts to writing, conversations controlling or changing their stipulations are, in the absence of fraud, no more received in a court of equity than in a court of law.

Upon a full consideration of the positions of the defendant we perceive none which should preclude the complainant from claiming a specific performance of the contract.

The only question remaining is, upon what terms shall the decree be made? and upon this we have no doubt.

The parties, at the time the proposition to sell, embodied in the covenant of the lease, was made, had reference to the currency then recognized by law as a legal tender, which consisted only of gold and silver coin. It was for a specific number of dollars of that character that the offer to sell was made, and it strikes one at once as inequitable to compel a transfer of the property for notes, worth when tendered in the market only a little more than one-half of the stipulated price. Such a substitution of notes for coin could not have been in the possible expectation of the parties. Nor is it reasonable to suppose, if it had been, that the covenant would ever have been inserted in the lease without some provision against the substitution. The complainant must, therefore, take his decree upon payment of the stipulated price in gold and silver coin. Whilst he seeks equity he must do equity.

The decree of the court below will, therefore, be REVERSED, and the cause remanded with directions to enter a decree for the execution, by the defendant to the complainant, of a conveyance of the premises with warranty, subject to the yearly ground-rent specified in the covenant in the lease, upon the payment by the latter of the instalments past due, with legal interest thereon, in gold and silver coin of the United States, and upon the execution of a trust deed of the premises to the defendant as security for the payment of the remaining instalments as they respectively become due, with legal interest thereon, in like coin; the amounts to be paid and secured to be stated, and the form of the deeds to be settled, by a master; the costs to be paid by the complainant.

The CHIEF JUSTICE with NELSON, J., concurred in the conclusion as above announced—that the complainant was entitled to specific performance on payment of the price of the land in gold and silver coin—but expressed their inability to yield their assent to the argument by which, in this case, it was supported.