LACEY *v.* BENNETT.

4-7935 195 S. W. 2d 341

Opinion delivered June 24, 1946.

*J. R. Crocker* and *Frank S. Quinn,* for appellant.

*McRae & Tompkins,* for appellee.

McFADDIN, J. This appeal challenges the correctness of the chancery court decree: (a) quieting appellee's title to certain lands; and (b) refusing appellant's prayer for specific performance of an alleged contract of appellee to convey the lands to appellant.

Appellee, H. C. Bennett, had owned for many years 260 acres of land in Nevada county. On December 31, 1941, appellant inquired of appellee by letter:

". . . your best terms on the above described property, least cash down and the length of time you will grant us to liquidate the balance. Terms under this agreement subject to acceptance on or before thirty days from date."

Appellee replied by telegram of January 2, 1942:

". . . the best price I could consider at this time is $3,500 cash."

To this the appellant replied by telegram of January 5, 1942:

"Accept your price of $3,500 cash. Send deed draft attached to Commercial Bank here in Shreveport and forward abstract to the firm of Smitherman and Smitherman, attys., attention Mr. David Smitherman. Regards."

It will be observed that the appellant in one sentence agreed to the $3,500 in cash, but in the next sentence wanted the deed sent to Shreveport, attached to a draft. The appellee replied to this telegram by letter of January 13, 1942, inquiring whether the appellant wanted the abstract as it was, or wanted it brought to date; and appellee also said:

"Would also like to have you arrange for the bank to write us directly that they have funds to your credit, and are ready to pay for the deed upon delivery."

Appellant answered under date of January 21, 1942, advising that he was having a supplemental abstract made at his own expense, and then said:

"As soon as the abstracting is completed, that is to say, your abstract is received and the supplemental abstract completed, I shall have the title examined by my attorney and if the title is marketable, funds will immediately be placed in the Commercial National Bank of Shreveport, Louisiana, to cover the purchase of the land, which bank I will have to write you to that effect and when this is done I understand that you will execute and mail a deed covering the land, to said bank, for delivery upon the payment of a draft to be drawn by you for $3,500 and attached to the deed, is paid."

It will be observed that appellant did not comply with appellee's request that the bank advise direct about the money, but stated that such would be done later, and after approval of title.

The letter of January 21st was the last written communication between the parties. Thereafter there were interviews by phone and messenger in which appellant was insisting that the abstract and deed be sent to the Shreveport bank, attached to a draft, and the appellee was insisting that appellant produce evidence that he had $3,500. Appellant failed to do this—in fact, until October, 1945.

During the time of the correspondence and prior to the interviews, appellant, on January 21, 1942, executed, acknowledged and placed of record in Nevada county, Arkansas, an affidavit which—omitting signature and acknowledgment—reads as follows:

"Before me the undersigned, a notary public, within and for the county aforesaid, personally appeared A. M. Lacey, who after having been duly sworn by me, on oath states: That he has had an agreement with Mr. H. C. Bennett, of Chicago, Illinois, for the purchase of the following lands, situated in Nevada county, Arkansas, to-wit:

"The northeast quarter of the southeast quarter and the southwest quarter of the southeast quarter, and the west half of the southeast quarter of the southeast quarter of section 21, and the northeast quarter of section 28,

all in township 14 south, range 22 west, containing in all 260 acres, more or less.

"That under said agreement the purchase price of the land is to be paid and the deed executed upon completion of abstracts and approval of title."

Appellee did not learn of this affidavit until some time later, and thereafter made no further effort to ascertain appellant's ability to obtain $3,500 in cash. With the affidavit on file, the appellant was apparently content to let the matter rest, except for infrequent inquiries made to appellee as to when appellee "would send the deed."

Thus, the matter remained from January, 1942, until May 7, 1945, when appellee filed this suit against appellant to have the affidavit removed from the record as a cloud on the title of the appellee. Appellant, by cross-complaint, filed September 9, 1945, claimed that the correspondence and telegrams between the parties made a valid and binding contract for appellee to convey to appellant; and alleged appellee's refusal to convey; and that appellant had "at all times stood ready, willing and anxious to comply with said contract." Appellant further pleaded:

"The defendant shows that the said plaintiff should be required to specifically perform his said contract, and this defendant here and now offers to pay to the said Bennett the said price agreed upon for said land, to-wit, the sum of $3,500 in cash."

The above quotation was the only tender ever made, except that the clerk of the court exhibited, at the trial, a telegram received by himself on October 24, 1945, from the Union National Bank of Laredo, Texas, which reads:

"We hold thirty-five hundred dollars to be paid to you upon acceptance of title by A. M. Lacey's attorneys, J. R. Crocker and Frank S. Quinn, on Bennett land which is now involved in your court."

In the alternative to specific performance, appellant, in his cross-complaint, asked $26,000 as damages, saying:

". . . that thereafter in the summer and fall of 1942, just a few months after defendant's said purchase, said lands rose in value to the sum of $100 per acre, the market value of said lands at its highest price since the purchase thereof by the defendant was and is the sum of $26,000."

Against appellant's cross-complaint for specific performance, appellee filed answer denying all allegations, and affirmatively pleading delay and laches, in this language:

"That defendant Lacey is guilty of laches, and has never tendered to plaintiff the $3,500 in question, but has sat idly by, for over three and one-half years, taking no affirmative action, speculating on the possible increase in the value of the minerals and timber in, under and upon said lands."

At the trial the parties introduced evidence to support their respective contentions as heretofore outlined; and, in addition, appellee testified that his previous dealings with the appellant (in 1937) had convinced him that appellant did not have, and could not secure, $3,500 unfettered money in January, 1942; and therefore appellee refused to send the deed to Shreveport until he received proof of the availability of the money. To support appellee's view of the financial condition of the appellant, several witnesses testified that in January, 1942, appellant could not get any money from anyone, and so admitted to some of the witnesses; that appellant had broken with his financial backer, and in January, 1942, was unable to finance any deal involving any sum of money.

The trial court entered a decree refusing specific performance and quieting appellee's title against the recorded affidavit. This appeal challenges the correctness of that decree. If appellant was not entitled to specific performance, then it necessarily follows that the appellee's title should be quieted against appellant's recorded affidavit. We proceed therefore to examine appellant's claim for specific performance.

There are certain essentials that must be proved by a party who seeks specific performance. A few of these are:

1. The existence of a valid and definite contract. As stated in 49 Am. Juris. 25: "In order for equity to decree specific performance, it is necessary that there be in existence and in effect a contract valid at law and binding upon the party against whom performance is sought, for specific performance is never applicable where there is no obligation to perform. If the existence of a valid contract is a matter of doubt, equity will not decree specific performance."

And, again, in 49 Am. Juris. 34: "In order for a court of equity to decree specific performance of a contract, the court must be able to determine what must be done to constitute performance. The indefiniteness of an agreement is an adequate reason for refusal to direct specific performance thereof. The contract itself must make the precise act, which is to be done, clearly ascertainable. . . .

"Whenever it appears that material matters are not clear, certain, and complete, but are left by the parties so obscure or undefined that the court cannot say whether or not the minds of the parties met upon all the essential particulars, or if they did, the court cannot say exactly upon what substantial terms they agreed, the case is not one for specific performance."

2. The party seeking specific performance must show that he has all the time been ready, able and willing to perform his part of the contract, and has not been guilty of unreasonable delay in seeking equitable relief. As stated in 49 Am. Juris. 53:

"The complainant coming into equity for specific performance must show not only that he has a valid, legally enforceable contract, but also that he has complied with its terms by performing or offering to perform, on his part, the acts which formed the consideration of the undertaking on the part of the defendant, or that he is ready, able, and willing to perform his obligations under

the contract, in their entirety, and to do whatever has been made a condition precedent on his part, or show a valid excuse for the nonperformance of the covenants incumbent upon him. . . .

"The failure or inability or refusal to carry out the terms of the contract at the time when performance is due will ordinarily be grounds for refusing specific performance, since specific performance will not generally be decreed in favor of a party who has himself been in default, or who has willfully violated his part of the contract, whereby the defendant has been deprived of a substantial benefit under it."

It is, furthermore, stated in 49 Am. Juris. 89:

"The well-established equitable principle that equity aids the vigilant and refuses to help those who sleep on their rights to the prejudice of the party against whom relief is asked is fully applicable to parties seeking specific performance of contracts. It is universally recognized that inexcusable laches or default on the part of the party seeking such relief will be a sufficient ground for the denial of the relief. While equity does not regard time as of the essence of the contract unless expressly made so by the contract, yet it requires that one who seeks specific performance of such contract shall not be guilty of unreasonable delay, and shall seek his redress with reasonable promptness. Any unreasonable delay or inexcusable negligence on the part of the plaintiff may be sufficient to prevent his procuring a decree in equity for specific performance. In a suit for specific performance of a contract to convey land, the vendor, to make the plaintiff's delay available as a defense, must have performed or been ready and willing to perform all the terms of the contract stipulated for on his own part. Laches is less excusable in regard to certain classes of property than others. For example, promptness in seeking specific performance is especially required in reference to contracts involving property likely to fluctuate suddenly in market value."

Appellee contends with much force that appellant has failed on both of these essentials, as above numbered and listed. Assuming—but not deciding—that the appellant has satisfied the first essential, still we are of the opinion that appellant has not proved the second such essential; and therefore the court of equity was correct in refusing him specific performance. Here are some of the matters reflected by the record:

1. Appellant claims that he made a contract by the correspondence previously mentioned. But when the appellee asked for some assurance from the bank that appellant had $3,500, the appellant parried the request and delayed furnishing any such bank assurance from January 13, 1942 (date of the request), until October 24, 1945, (date of the telegram from the Laredo, Texas, bank to the clerk of the court). This constituted a delay of more than three years and nine months.

2. Appellant placed the affidavit of record on January 21, 1942, but took no action to secure specific performance until he filed his cross-complaint on September 11, 1945. He acted then only after the appellee had hailed him into court on the proceeding to quiet the appellee's title. In the intervening time—January, 1942, to September, 1945—there had been, according to appellant's own allegations, an "oil play" regarding this land, which caused the value of the land to increase to $26,000. It is true that the "oil play" subsided, and that—at the time of the trial—some witnesses placed the value of the land at $4,000; but there had been a fluctuation in land values, and appellant, by his affidavit, had clouded the appellee's title, and then delayed for over three and one-half years to seek specific performance.

Appellant's delay under the facts in this case is entirely unreasonable, and fully justified the refusal of a court of equity to decree specific performance. In *Uzzell* v. *Gates*, 103 Ark. 191, 146 S. W. 495 and 1184, Chief Justice McCulloch said:

"We are of the opinion, however, that Gates did not proceed with sufficient diligence to warrant a court of

equity, under the circumstances, in granting him the relief prayed for and to require appellant to specifically perform, the contract. The rule is of well-nigh universal application that a purchaser of land under an executory contract, who is out of possession and has not paid the purchase price, must proceed within a reasonable time, otherwise he will be barred by his own laches from seeking the aid of a court of equity to·require specific performance. 36 Cyc. 721; Pomeroy on Specific Performance of Contracts, §§ 403-4. In *Milward* v. *Earl Thanet,* 5 Ves. 720, Lord Alvanley said that 'a party can not call upon a court of equity for specific performance unless he has shown himself ready, desirous, prompt and eager.' And in *Eads* v. *Williams,* 4 De G., M. & G. 691, Lord Cranworth stated the rule, as Prof. Pomeroy says, 'in a manner not quite so rhetorical, but perhaps more accurate,' that 'specific performance is relief which this court will not give, unless in cases where the parties seeking it come as promptly as the nature of the case will permit.' "

Likewise, in *Bracy* v. *Miller,* 169 Ark. 1115, 278 S. W. 41, 43 A. L. R. 114, we said:

"It is a general rule of equity that a party entitled to a specific conveyance of property will not be permitted to hold back from an assertion of his rights and thus speculate on the advantage of performance, but he is required to be vigilant and prompt in the assertion of those rights; otherwise equity will refuse its aid and leave the party to such redress which the law had left him by a suit for damages. *DeCordova* v. *Smith,* 9 Tex. 129, 58 Am. Dec. 136.

". . . He could not have asked the enforcement of his contractual rights without complying with the implied condition of the contract that he act with reasonable promptness, and this is a condition which equity also imposes as a prerequisite before granting the relief of specific performance." See, also, *Hargis* v. *Edrington,* 113 Ark. 433, 168 S. W. 1095, and *Henley* v. *Engler,* 118 Ark. 283, 176 S. W. 330.

*Sharpe* v. *West,* 150 Fed. 458, was a case decided in the U. S. District Court for the Western District of Arkansas. Judge Rogers delivered the opinion, which is so apropos to this case that we quote at length:

"It is also insisted that inasmuch as no tender was ever made and no suit begun until over three years after the alleged contract was made, it would be inequitable and unjust for a court of equity, under such circumstances, to compel specific performance, even if the alleged contract was originally valid and binding. This court, upon authorities quoted in the case of *Erastus Jones* v. *Lawrence A. Byrne, et al.,* 149 Fed. 457, said:

" 'Specific performance is not of absolute right. It rests entirely in juridial discretion, exercised, it is true, according to the settled principles of equity, and not arbitrarily or capriciously, yet always with reference to the facts of the particular case. *Willard* v. *Tayloe,* 8 Wall. 557, 567, 19 L. Ed. 501; *Marble Co.* v. *Ripley,* 10 Wall. 339, 357, 19 L. Ed. 955; 1 Story's Eq. Jur., § 742; *Seymour* v. *Delancey,* 6 Johns. Ch. (N. Y.) 222, 224. "The question in cases of specific performance," Lord Eldon said, "is not what the court must do, but what, under the circumstances, it may do, in the exercise of its discretion to grant or withhold relief of that character." *White* v. *Damon,* 7 Ves. 30, 35; *Radcliffe* v. *Warrington,* 12 Ves. 326, 331. It should never be granted unless the terms of the agreement sought to be enforced are clearly proved, or, where it is left in doubt, whether the party against whom relief is asked in fact made such an agreement. *Colson* v. *Thompson,* 2 Wheat. 336, 341, 4 L. Ed. 253; *Carr* v. *Duval,* 14 Pet. 77, 83, 10 L. Ed. 361; *Huddleston* v. *Briscoe,* 11 Ves. 583, 591; *Lanz* v. *McLaughlin,* 14 Minn. 72 (Gil. 55); *Waters* v. *Howard,* 1 Md. Ch. 112, 116.'

"In this case there is not the semblance of any reason or face assigned why the institution of this suit was delayed over three years after the alleged contract was made. . . . The general rule governing cases of this kind will be found in Warvelle on Vendors, vol. 2, par.

746, and is substantially this: That a specific performance will not be decreed where any unreasonable delay has occurred, and especially if the value of the property or the conditions of the parties has changed in the meantime. In other words, where the lapse of time has been very great, or where the value of the property has materially changed, the laches of the one will excuse performance by the other, and equity refusing to interfere will leave the parties to their remedies at law.''

Fry on "Specific Performance" is a British publication; but, even so, has long been recognized as a standard authority in this country, and was cited with approval by this court in *Bracy* v. *Miller, supra,* in 1925. In the Sixth Edition of Fry on "Specific Performance," there is a discussion on the subject of lapse of time as defeating specific performance; and on page 516, this appears:

"In many of the cases there has been a general dilatoriness in all the proceedings, so that it is almost impossible to state briefly the actual amount of delay which has been considered to bar the plaintiff's right to relief; but some notion of the present doctrine of the courts on this point will be gained from the following cases:

"In the old case of *The Marquis of Hertford* v. *Boore,*[6] a delay of fourteen months was not considered a bar to the plaintiff's bill. But in *Eads* v. *Williams*[7] where the contract was for the lease of a coal mine), a delay of three and a half years was considered fatal; in *Southcomb* v. *The Bishop of Exeter,*[8] a delay from the 17th of January, 1842, to the 30th August, 1843, was held to have the same effect; and in *Lord James Stuart* v. *The London & North-Western Railway Co.,*[9] Knight Bruce, L. J., seemed to think that a delay from October, 1848, to July, 1850, must be fatal to such a bill.''

---

[6] 5 Ves. 719.

[7] 4 De G. M. & G. 674; 24 L. J. Ch. 501; cf. *supra*, § 1082.

[8] 6 Ha. 213.

[9] 1 De. G. M. & G. 721. See, also, *Spurrier* v. *Hancock,* 4 Ves. 667; *Harrington* v. *Wheeler,* 4 Ves. 686; *Guest* v. *Homfray,* 5 Ves. 818; *Thomas* v. *Blackman,* 1 Coll. 301, 313; *Sharp* v. *Wright,* 28 Beav. 150; *Moore* v. *Marrable,* L. R. 1 Ch. 217.''

288

In 65 A. L. R. 7 there is an extensive annotation on specific performance; and, on page 53, scores of cases from Federal and State and English courts are cited to sustain this summary:

"To secure the aid of equity in enforcing the performance of a contract, it must be made to appear that the plaintiff or complainant has been prompt, ready, able, and eager to perform and abide by the same. If he has failed or refused to claim or act under the contract for such a length of time as to give the impression that he has waived or abandoned the sale or purchase, especially if circumstances justify the belief that his intention was to perform the contract only in case it suited his interests, he will be denied this equitable relief. The rule that, to be entitled to the specific performance of a contract, the party seeking such relief must show that he has been at all times ready, able, and willing to perform on his part, is quite universally recognized in holding that inexcusable laches or default on the part of the party seeking such relief will be a sufficient ground for the denial of the relief."

The decree of the chancery court is in all things affirmed.