WELBORNE *v.* PREFERRED RISK INSURANCE Co.

5-2262                                    340 S. W. 2d 586

Opinion delivered December 5, 1960.

*Little & Enfield, J. R. Crocker* and *J. F. Robinson,* for appellant.

*Dickson, Putnam & Millwee, Wright, Lindsey, Jennings, Lester & Shults,* for appellee.

CARLETON HARRIS, Chief Justice. This appeal results from a decree entered by the Chancery Court wherein the complaint of appellant seeking specific performance of an alleged agreement, was dismissed for want of equity.

Suit was instituted by appellant on May 28, 1958, seeking to enforce alleged rights under a pre-incorporation subscription offer executed by him in favor of appellee on March 31, 1954. Prior to this time, Welborne was a stockholder and member of the Board of Directors of Preferred Risk Mutual Insurance Company. On the aforesaid date, the mutual insurance company was converted to its present status as a stock company, and known as Preferred Risk Insurance Company. Appellant was a stockholder, and served as an officer and director in the company until May 26, 1956, when he resigned from the Board of Directors. He remained an employee of appellee until February, 1957, and, as of February 27th of that year, sold all shares that he owned in the company. The subscription agreement entered into on March 31, 1954, is as follows:

"WHEREAS, it is the desire of the undersigned to purchase 1,000 shares of common stock, par value Ten Dollars ($10.00), in an insurance corporation to be known as the Preferred Risk Insurance Company.

NOW, THEREFORE, BE IT AGREED AS FOLLOWS: That for and in consideration of the agreement of the undersigned to purchase the aforesaid shares of stock, and for and in consideration of the mutual promises of other subscribers to additional shares of common stock in said corporation to be formed, that the undersigned agrees to purchase from said corporation the above stock, on demand of said corporation."

The stock structure of the appellee is reflected by the minutes of the meetings of the Board of Directors. On June 30, 1954, a motion was unanimously passed by the Board providing that stock subscribed to at $20 a share prior to the organization of the company, be delivered before July 20, 1954, to those paying said purchase price,[1] and that no further stock be sold at this price without further authorization of the Board of Directors. Appellant was present at this Board meeting. In subsequent meetings, par value of stock was reduced from $10 to $1 per share, and the Board unanimously passed a motion that stockholders of record as of May 1, 1956, be offered one share of stock for each three shares held, the $1 par value stock to be offered for $2.50 per share. The record reflects that appellant bought 1,200 shares of this stock, apparently at the offered price of $2.50 per share. The Board, on May 23, 1956, with appellant present, unanimously voted to offer a public issue of stock at $15 per share (par value $1) and a motion was also passed unanimously providing "that all holders of rights or options to purchase stock be notified that any such right to purchase stock below the Public Issue price shall be void and of no effect after June 30, 1956." Sometime during this year, the subscription instrument was returned to Welborne, according to W. M. Ritter, president of the company, at appellant's request. In

---

[1] Originally, the par value of the stock was $10 per share, but the initial subscribers agreed to pay $20 per share.

June, 1957, a stock dividend on the basis of two shares for each outstanding share was declared. On March 25, 1958, Ritter directed a letter to Welborne, stating that the Board of Directors had voted to make demand upon each subscriber for the amount of stock subscribed, at $7.50[2] per share for the $1 par value stock. The letter states:

"Your subscription was for 10,000 shares, therefore the amount necessary to carry it out would be 10,000 x $7.50. The other alternative provided by the Resolution is that you release the subscription by signing the attached release.

We presume that you will not want to complete the subscription and therefore ask that you sign and return three copies of the attached release by return mail."

Welborne replied as follows:

"Pursuant to your demand of March 25, 1958, I hereby tender you $10,000.00 in cash and request that your company in return issue to me 30,000 shares of $1.00 par value common stock of the Preferred Risk Insurance Company as per my subscription agreement signed by me on the 31st day of March, 1954."

Appellee declined to accept this proposition, and suit followed.

Appellant contends that the subscription was a contract which he is entitled to enforce by specific performance, and appellee asserts five different defenses. We deem a discussion of the various contentions advanced by the parties to be unnecessary, in view of the fact that we consider this litigation to be controlled by the doctrine of laches. This defense is closely associated with estoppel, upon which doctrine the Chancellor's decision was predicated, and we might here say that this is likewise a valid defense in this case.

Laches is defined by Bouvier's Law Dictionary (Third Revision) as "unreasonable delay; neglect to do

---

[2] Apparently the price for the public issue had been reduced from $15 to $7.50.

a thing or to seek to enforce a right at a proper time.'' Also, ''The neglect to do what in law should have been done, for an unreasonable and unexplained length of time, and under circumstances permitting diligence.'' Appellant's right to purchase common stock came into being in March, 1954. The record does not reflect the reason for appellant's failure to exercise this right at that time, or in the subsequent months and years, though appellant, as a stockholder, officer, and director, in the company, was familiar with, and had participated in, the various board meetings heretofore enumerated; no effort was ever made to enforce any purported rights under the subscription until the letter was received from President Ritter. This letter cannot be relied upon by appellant, for it was written without authority; *i. e.*, the record reflects no authorization from the board for the proposition contained in the letter. For that matter, this proposal was entirely different from the terms of the original subscription, and, as earlier mentioned, according to the record, the subscription instrument had already been reclaimed by Welborne sometime in 1956.

It is at once apparent that enforcement of Welborne's claim would be most inequitable, for it would permit appellant to stand by for an unreasonable and unexplained length of time (four years), and as far as this record reflects, under circumstances permitting diligence—yet, glean high profits through such conduct.[3] We consider the language in *Austin* v. *Hallmark Oil Co.,* 21 Cal. 2d 718, 134 P. 2d 777, to be entirely apropos:

[3] Appellee, in its brief, states: "It would be a monstrous result if the law were such that a person could remain mute for more than four years and obtain 30,000 shares of $1.00 par value stock having a public sale price of $225,000.00 (*i.e.*, $7.50 per share) upon payment of the mere sum of $10,000.00." In his reply, appellant states: "The stock of Preferred Risk Insurance Company is not listed for sale on any exchange. Its value depends on finding a buyer and dealing with him on whatever price he is willing to pay. There was no showing in the record of the number of shares which have been sold by appellee at $7.50 per share or at any other price. Appellee's contention that the stock in litigation here is worth $225,000.00 is a mere fantasy * * *." Irrespective of the accuracy of appellee's statement, it is obvious that the stock has increased considerably in value.

"It is not appropriate to grant specific performance of a subscription contract when the complainant, instead of paying for the stock subscribed to at the time the corporation is in great need of funds, does not offer to pay until the success of the venture undertaken by the corporation is assured."

As stated in 49 American Jurisprudence, under the heading "Specific Performance", § 73, p. 89:

"The well-established equitable principle that equity aids the vigilant and refuses to help those who sleep on their rights to the prejudice of the party against whom relief is asked is fully applicable to parties seeking specific performance of contracts. It is universally recognized that inexcusable laches or default on the part of the party seeking such relief will be a sufficient ground for the denial of the relief. * * * Laches is less excusable in regard to certain classes of property than others. For example, promptness in seeking specific performance is especially required in reference to contracts involving property likely to fluctuate suddenly in market value."

Also, from § 76, page 93:

"A common consequence of delay is a change in value of the property which is the subject of the contract, and where this has taken place the courts will usually decline to enforce specific performance. This rule is especially applicable where the complainant has laid by apparently for the purpose of taking advantage of the change in value. Equity will not relieve one guilty of gross delay who has lain by until events enabled him to make his election as to completing the contract with certainty of advantage to himself. Equity will not enable a party to speculate upon the advantage of a contract by permitting him to hold back from the assertion of his rights until it is clear that the contract is to his advantage, and then allow him to have specific performance, and thus encourage delays and favor speculation in possible changes in value. * * * Promptness on the part of the complainant in seeking enforce-

ment or in performing his part of the contract seems to be especially necessary in the case of property which is particularly subject to fluctuation, such as corporate stock.''

In *Lacey* v. *Bennett*, 210 Ark. 277, 195 S. W. 2d 341 (1946), appellant entered into a contract on January 5, 1942, for the purchase of real property, but did nothing to assert his rights until September 9, 1945, when he sought specific performance in a cross-complaint, after Bennett had instituted suit to quiet title. In upholding the trial court's decree refusing specific performance, this Court quoted from 65 A. L. R., page 53, as follows:

''To secure the aid of equity in enforcing the performance of a contract, it must be made to appear that the plaintiff or complainant has been prompt, ready, able, and eager to perform and abide by the same. If he has failed or refused to claim or act under the contract for such a length of time as to give the impression that he has waived or abandoned the sale or purchase, especially if circumstances justify the belief that his intention was to perform the contract only in case it suited his interests, he will be denied this equitable relief. The rule that, to be entitled to the specific performance of a contract, the party seeking such relief must show that he has been at all times ready, able, and willing to perform on his part, is quite universally recognized in holding that inexcusable laches or default on the part of the party seeking such relief will be a sufficient ground for the denial of the relief.''

Affirmed.