## DUNLOP v. BAKER et al.

(Circuit Court of Appeals, Fourth Circuit. November 9, 1916.)

No. 1424.

1. SPECIFIC PERFORMANCE ⬤⟿57—CONTRACTS ENFORCEABLE—OPTION—"CONTRACT OF SALE."

A written instrument, under seal and expressing a consideration, granting an option to purchase real estate, on election by the other party to exercise the option, becomes a valid and binding "contract of sale," which may be specifically enforced in equity.

[Ed. Note.—For other cases, see Specific Performance, Cent. Dig. § 178; Dec. Dig. ⬤⟿57.

For other definitions, see Words and Phrases, First and Second Series, Contract of Sale.]

2. VENDOR AND PURCHASER ⬤⟿21—VALIDITY OF CONTRACT—CERTAINTY.

Expression of the time of payment is not essential to the validity of a contract for the sale of real estate.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 6, 25, 26, 89; Dec. Dig. ⬤⟿21.]

3. SUNDAY ⬤⟿13—CONSTRUCTION OF STATUTE—VALIDITY OF CONTRACTS.

Code Va. 1904, § 3799, which makes it a criminal offense if "a person on the Sabbath day be found laboring at any trade or calling," does not render illegal an instrument granting an option to purchase real estate, because executed on Sunday.

[Ed. Note.—For other cases, see Sunday, Cent. Dig. §§ 36–44; Dec. Dig. ⬤⟿13.]

4. BANKRUPTCY ⬤⟿293(1)—JURISDICTION OF COURT—CONTROVERSIES RESPECTING PROPERTY.

A court of bankruptcy has jurisdiction to determine any controversy over the distribution of property which has come into its possession as part of the estate of a bankrupt.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 411; Dec. Dig. ⬤⟿293(1).]

5. BANKRUPTCY ⬤⟿254—JURISDICTION OF COURT—SPECIFIC ENFORCEMENT OF BANKRUPT'S CONTRACTS.

On the day before filing his petition in bankruptcy, a bankrupt and his wife executed an instrument granting to petitioner an option to purchase certain land. After the adjudication, but within the time limited by the option, petitioner filed his petition in the bankruptcy court, praying for specific performance, and offering to pay a sum, in addition to the option price, sufficient to complete payment of all claims against the estate and the costs of the proceedings. Held, that the court had jurisdiction to entertain the petition, and that by filing it petitioner accepted the offer made by the option, and converted it into a contract of sale, which, being valid, he was entitled to have enforced, subject only to the rights of creditors.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. ⬤⟿254.]

6. BANKRUPTCY ⬤⟿267—CONTRACT OF BANKRUPT—PETITION FOR SPECIFIC ENFORCEMENT.

Petitioner was not barred of the right to the benefit of his contract by the fact that the land was subsequently sold by the trustees under an order which expressly transferred all liens upon and claims to the property to

⬤⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

its proceeds, but was entitled to any surplus of the proceeds after payment of the debts and costs and expenses of the proceedings.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 371, 380; Dec. Dig. ⊕═267.]

Johnson, District Judge, dissenting.

Appeal from the District Court of the United States for the Eastern District of Virginia, at Richmond, in Bankruptcy; Edmund Waddill, Jr., Judge.

In the matter of Robert Edward Baker, bankrupt. Petition by J. J. Dunlop against Robert Edward Baker and wife, and D. Hamilton Willcox, Lawrence P. Poole, and C. H. Joyner, trustees. From an order denying his petition for equitable relief, Dunlop appeals. Reversed.

L. L. Lewis, of Richmond, Va., and Charles E. Plummer, of Petersburg, Va., for appellant.

Richard H. Mann and Bernard C. Syme, both of Petersburg, Va., and Edwin P. Cox, of Richmond, Va. (Mann, Syme, Wilson & Mann, of Petersburg, Va., on the brief), for appellees.

Before KNAPP and WOODS, Circuit Judges, and JOHNSON, District Judge.

WOODS, Circuit Judge. The ultimate practical question in this appeal is whether the bankrupt, Robert E. Baker, may escape from an option agreement made by him to sell a tract of land to the petitioner, J. J. Dunlop, which turned out to be disadvantageous. The option executed by Baker and his wife, Lillie M. Baker, under seal, was in these words:

"For and in consideration of one dollar, to me in hand paid, the receipt of which is hereby acknowledged, and other good and sufficient considerations, I hereby agree to give J. J. Dunlop, or assigns, the exclusive right to purchase the 418 acres of land owned by Robt. E. Baker, situated in Prince George county, state of Virginia, with the appurtenances thereunto belonging, for the sum of $12,000 from the 9th day of April, 1915, to the 9th day of July, 1915, upon the following terms, $200 on signing of contract, and trust for balance of equity, on the delivery of good and sufficient warranty deed, and the balance as follows: Purchaser to assume existing trust on property."

The date on the paper was April 9, 1915, but the real day of execution was Sunday, April 11, 1915. On the following day, April 12th, Baker filed his petition in bankruptcy, and the adjudication immediately followed. Among the assets set down in his schedule by the bankrupt was the tract of land described in the option at a valuation of $12,000. On May 1st, Dunlop filed a petition in the bankruptcy proceedings, setting up the option, and asking that he be allowed to pay into court the purchase money, $12,000, and that, upon the payment, the trustees be directed to convey the land to him free of liens. On May 8th the bankrupt, answering the petition, admitted its allegations and joined in its prayer. On May 20th Dunlop filed an amended petition, alleging that when he filed the original petition he was advised that the bankrupt's assets would be more than sufficient to pay

his debts, but that it had developed at the hearing before the referee that the liabilities might exceed the assets; that the rights of the petitioner under his option were inferior to the lien given to the trustees for the benefit of creditors under section 47 of the Bankruptcy Act (Act July 1, 1898, c. 541, 30 Stat. 557 [Comp. St. 1913, § 9631]); that in order to protect his rights he offered to pay into court such amount, in addition to the purchase price of $12,000, as may be necessary to pay all the debts of the bankrupt and costs of the proceedings; that in exercising his rights to discharge the lien of the trustees he was—

"entitled to be subrogated to all rights against the bankrupt and his creditors, and therefore to the right to contest all claims which may be filed against said bankrupt, and the further right to require the marshaling of the assets of said bankrupt, and such application of said assets as will protect your petitioner's right in the premises."

The petitioner asked on these allegations that the title be made to him on his making a deposit in bank awaiting the determination of the questions that might arise, and to be applied as the court might determine. The bankrupt, by his answer filed on May 28th, completely reversing his position, denied the rights of the petitioner to have the relief sought, even under the facts stated in the petition, and set up the following affirmative defenses: (1) Want of any consideration for the option; (2) such indefiniteness and uncertainty in the option as to make it incapable of enforcement; (3) invalidity of the contract because executed on Sunday. The answer of Lillie M. Baker, wife of the bankrupt, set up substantially the same defenses.

It is needless to recite the steps through which the controversy finally reached the District Court and was decided. The court dismissed the petition and ordered the land to be sold at public auction; but the order provided "that all valid liens upon and claims to the said property be, and they are hereby, transferred and shall attach to the proceeds of sale." At the sale the land brought $31,000. The aggregate of the debts of the bankrupt and costs and expenses of the proceedings is $18,853.43.

The facts agreed on before the District Court may be thus summarized: (1) Execution of the option on Sunday, and the procurement by Dunlop of other options on other lands in the vicinity during the months of April and May, 1915; (2) the sale of other lands near by just before the trial at $125 per acre; (3) the knowledge by Dunlop, immediately after he had procured the option, that Baker, before giving it, had signed his petition and schedule in bankruptcy, and had placed them in the hands of his attorney for filing; (4) the existence of liens on the land at the time the option was given, in the form of deeds of trust, aggregating $8,000 and interest.

[1] For the sake of clearness we consider, first, whether there was ever any contract to sell the land binding on the bankrupt. The defense of want of consideration cannot be sustained; for the option was under seal and expressed the consideration of "one dollar and other good and sufficient consideration," and no evidence is offered that the paper spoke falsely in this respect. The point was elaborately

discussed by Judge Cardwell in Watkins v. Robertson, 105 Va. 269, 54 S. E. 33, 5 L. R. A. (N. S.) 1194, 115 Am. St. Rep. 880, the court holding that an option under seal for the sale of certain shares of stock, expressing the consideration of $1 and the condition that it be accepted within a stated time, should be treated as an irrevocable covenant, of which equity would enforce specific performance upon due acceptance by the optionee. The court said that the case of Graybill v. Brugh, 89 Va. 895, 17 S. E. 558, 21 L. R. A. 133, 37 Am. St. Rep. 894, which expressed a contrary view, was to be considered practically overruled by Central L. Co. v. Johnston, 95 Va. 223, 28 S. E. 175. The Supreme Court of the United States thus states the familiar rule:

"The covenant in the lease giving the right or option to purchase the premises was in the nature of a continuing offer to sell. It was a proposition extending through the period of ten years, and being under seal must be regarded as made upon a sufficient consideration, and therefore one from which the defendant was not at liberty to recede. When accepted by the complainant by his notice to the defendant, a contract of sale between the parties was completed. * * * When a contract is of this character, it is the usual practice of courts of equity to enforce its specific execution upon the application of the party who has complied with its stipulations on his part, or has seasonably and in good faith offered, and continues ready, to comply with them." Willard v. Tayloe, 75 U. S. (8 Wall.) 557, 19 L. Ed. 501, 21 L. R. A. 129, note.

[2] The defense of indefiniteness and uncertainty is equally unfounded. The option clearly meant that upon its acceptance and the execution of the contract of sale the purchaser was to pay $200 in cash, assume the payment of the debts secured by the trust deeds covering the property, and execute for the benefit of the seller a trust deed as security for the difference between the purchase price, $12,000, and the aggregate of the cash payment and the liens assumed by the purchaser. This construction of the contract was assented to as correct by the bankrupt in his answer to the original petition. The only item not definitely fixed was the time for the payment of the balance going to the seller. But it is settled by authority from which there is no dissent that expression of the time of payment is not essential to the validity of a contract of sale. If no time be mentioned, it is to be inferred that either immediate payment or payment in a reasonable time according to the circumstances is intended. 36 Cyc. 597, and authorities cited.

[3] This brings us to the question whether an option executed for valuable consideration is invalid because executed on Sunday. The Virginia statute provides:

"If a person on the Sabbath day be found laboring at any trade or calling, or employ his apprentices or servants in labor or other business, except household or other work of necessity or charity, he shall be deemed guilty of a misdemeanor," etc. Code 1904, § 3799.

In the absence of any construction of this statute by the Virginia court, we must depend upon reason and the construction of similar statutes by other courts. The state statutes on the subject may be divided into two classes. In a large number of the states the prohibition

is against the doing of any business or labor on Sunday. In these states it has been generally held in cases too numerous for citation that the giving of a note, or bond, or mortgage, or conveyance is doing business, and therefore is within the statute.

In other states, however, the statutes do not make every isolated business transaction criminal. These express a different purpose, namely, the stopping and breaking of the continuity of the trades and callings—the regular everyday occupations—of the people, to the end that the individual and the public at large may have the benefits expected from the general observance of the Sabbath. Their language seems carefully chosen to exclude the idea that the citizen may be harassed by prosecution for every incidental or isolated transaction he may make on Sunday. The English statute is in this class, enacting that:

"No persons shall do or exercise any worldly labor, business, or work of their ordinary calling upon the Lord's day."

So it was held in Drury v. Defontaine, 1 Taunt. 131, and Bloxsome v. Williams, 3 B. & C. 232, that the sale of a horse and a contract of hiring, not made in the ordinary calling of either party to the contract, were valid. Rex v. Inhabitants of Whitnash, 7 B. & C. 596. The Georgia, North Carolina, and South Carolina statutes in like terms were given the same construction in Dorough v. Equitable Mortgage Co., 118 Ga. 178, 45 S. E. 22; Rodman v. Robinson, 134 N. C. 503, 47 S. E. 19, 65 L. R. A. 682, 101 Am. St. Rep. 877; Hellams v. Abercrombie, 15 S. C. 110, 40 Am. Rep. 684. The Virginia statute is substantially the same. The difference between doing "any labor, business, or work of their ordinary calling" of the English statute, and the "laboring at any trade or calling" in the Virginia statute, is too shadowy for judicial recognition. Both statutes limit the prohibition to the prosecution of any usual or regular occupation or business, and they exclude the idea of punishment for isolated transactions. On the point now involved the distinction between "their ordinary callings" of the English statute, and "any trade or calling" of the Virginia, is unsubstantial. One transaction, such as hiring a servant, or conveying land, or taking a note or option, unconnected by continuity with other transactions of a like nature, cannot be laboring at a trade or calling of any kind. There is no evidence that either Baker gave, or that Dunlop took, the option in the course of any trade or calling. True, it was agreed that Dunlop during the months of April and May was getting options on other lands in the vicinity, but that does not warrant the conclusion that he was engaged in taking options as a calling or vocation. We think the fact that the option was taken on Sunday did not invalidate it.

It is true that the granting or refusing of specific performance is a matter within the discretion of the court, controlled by the general principles of equity; but judicial discretion does not extend to the refusal of specific performance of a definite contract untainted by injustice or hardship. Certainly the mere rise in the value of the property has never been recognized as a justification for denying the purchaser the right to the land for which he has bargained. There is no element of injustice or hardship, and we can discover no ground which would justify a court of equity in refusing to enforce the contract. Willard v. Tayloe, 75 U. S. 557, 19 L. Ed. 501.

[4] Having reached the conclusion that the option was good, the next question is: What rights did Dunlop, the optionee, have enforceable in the bankruptcy proceedings? There can be no doubt that the petition of Dunlop, setting up his status with respect to the property, and asking that he have title to it in compliance with the terms of his option, and the denial by the trustees and the bankrupt of his right to the relief asked, made a controversy in relation to the bankrupt estate which the court had jurisdiction to determine under section 2 of the Bankruptcy Act (Comp. St. 1913, § 9586). There was abundant power in the court to decree specific performance, or grant any other equitable relief which may be necessary in the administration and distribution of the bankrupt estate. In Whitney v. Wenman, 198 U. S. 539, 25 Sup. Ct. 778, 49 L. Ed. 1157, the true result of a review of the cases was said to be:

"That when the property has become subject to the jurisdiction of the bankruptcy court as that of the bankrupt, whether held by him or for him, jurisdiction exists to determine controversies in relation to the disposition of the same and the extent and character of liens thereon or rights therein." Hebert v. Crawford, 228 U. S. 204, 33 Sup. Ct. 484, 57 L. Ed. 800.

Clearly the appeal presents to this court one of those controversies arising in bankruptcy proceedings appealable under section 24a of the act (Comp. St. 1913, § 9608). Moody v. Century Bank, 239 U. S. 374, 36 Sup. Ct. 111, 60 L. Ed. 336.

[5] The bankruptcy court having jurisdiction of the subject-matter and the custody of the property, the filing of the petition for the enforcement of the option was an acceptance of it, and the contract of purchase was thereby perfected, and became binding on both parties, subject, of course, to the rights of creditors. The law has been long settled that the filing of the bill for specific performance is a sufficient acceptance of an offer to sell, making mutual a unilateral contract. Ives v. Hazard, 4 R. I. 14, 67 Am. Dec. 500; Woodruff v. Woodruff, 44 N. J. Eq. 349, 16 Atl. 4, 1 L. R. A. 380; 21 L. R. A. 131, note. But if it be considered that the filing of the original petition did not have this effect, because of the intervening lien in favor of the trustees, it cannot be doubted that the filing of the amended petition of May 26th was an acceptance, and made the contract binding. At that time the option had not expired, and Baker had not in any way attempted to withdraw it. It is true that bankruptcy had supervened, but that had no other effect than to place the property in the hands of the bankruptcy court, with a lien on it for the debts of the bankrupt and the costs superior to the claim of Dunlop. Nothing but this lien stood between Dunlop and his right to a conveyance of the land upon payment of the purchase money agreed on. It follows that, when he offered to pay a sum in addition to the agreed price sufficient to satisfy the claims superior to his own, he was entitled to the land. In principle the case stands as if Baker had given the option, and then executed to another a mortgage without notice of the option for more than the price stated in the óption. Surely, in that case Baker could not have set up the mortgage as an obstruction to specific performance, in the face of the offer of the optionee to pay enough above the price agreed on to remove the incumbrance.

Finally, we think these conclusions may be stated as evident: Before the petition in bankruptcy, Dunlop had an option on the land, good and enforceable against Baker. After the filing of the petition in bankruptcy, the right of Dunlop became subordinate to the superior lien of the trustees, to the extent of the bankrupt's debts and the costs of the proceedings. When Dunlop filed his petition to be allowed to exercise his option, and to protect it by paying into court, not only the option price, but a sum which, together with the price, would satisfy the debts and costs, equity required that he be allowed to pay in the money and to have a conveyance of the property. As holder of a claim to the property subordinate to the lien in favor of the trustees for the benefit of creditors, under a familiar equity rule, he had the right to be subrogated to the rights of the trustees and creditors upon payment of all debts and costs.

The personal pronoun "I," in the clause of the option "I hereby agree to give J. J. Dunlop, or assigns, the exclusive right," etc., refers to both Robert E. Baker and Lillie M. Baker, since both signed the option. Holman v. Gilliam, 6 Rand. (Va.) 39. The decree of the court should have been in accordance with these conclusions, and conveyance should have been made to Dunlop upon payment, according to his offer, of all debts and costs of the proceedings.

[6] It is argued, however, that these rights have been lost by the sale of the land under the order of the court. Without objection from the bankrupt or the trustees, the order of sale provided: ·

"That all valid liens upon and claims to the said property be, and the same are hereby, transferred and shall attach to the proceeds of sale."

Under this order the optionee, Dunlop, has the same right in the proceeds of sale as he had in the land before its sale. The debts and costs considerably exceed the price mentioned in the option. The effect of giving Dunlop the benefit of his option and subrogation to the rights of creditors, which he would have had but for the error of the court in refusing his offer, is to decree the payment to him of the surplus proceeds of the sale after the payment in full of all the debts of the bankrupt, and the costs of the administration; and it will be so decreed.

Reversed.

JOHNSON, District Judge (dissenting). I dissent. Surely there is no principle of law or equity correctly applied that requires a court of bankruptcy to give to a mere unilateral option, which had not been accepted at the time of adjudication in bankruptcy, the same legal effect as a deed of warranty. Surely the court is not constrained to rule that the holder of an unaccepted option at the time of bankruptcy shall come into the bankrupt court and have his option declared superior to the dower rights of the bankrupt's wife. It is shocking to the conscience to be told that the holder of a Sunday unilateral option, which had not been accepted at the time of bankruptcy, should be held to have the equity of redemption, and be entitled to the same rights as if he had actually entered into a contract to purchase the land and had actually paid every dollar of the purchase money. The

majority opinion does all these things in the teeth of the fact that no part of the purchase money has been paid.

There was no contract between Baker and Dunlop for the sale of the land at the time of Baker's adjudication in bankruptcy. It is not contended that Dunlop, at the time of Baker's adjudication in bankruptcy, had anything more than a unilateral option, which permitted, but did not obligate, him to purchase a certain tract of land within three months for the sum of $12,000. That offer was not accepted prior to the adjudication. The court of bankruptcy at the time of adjudication takes charge of the the bankrupt's property to administer according to law. The claims that can be proved against the bankrupt estate are defined in section 63a and section 63b of the Bankrupt Act (Comp. St. 1913, § 9647). Section 63a provides for liquidated demands owing at the time of the filing of the petition, and section 63b provides for unliquidated demands. It will be observed that section 63b in no manner enlarges the character of claims referred to in section 63a. Whether the demand or claim is liquidated or unliquidated, it must have existed at the time of the filing of the petition. What the bankrupt earns after his adjudication is his own, and the trustee has no claim on it. Likewise obligations subsequent to adjudication cannot be proved against the bankrupt estate. Neither subsequent claims nor subsequent earnings have any part in the proceeding. The discharge in bankruptcy releases the bankrupt from provable demands only; that is, such as existed at the time of adjudication and could have been proved under sections 63a and 63b.

The majority opinion holds that the court of bankruptcy has jurisdiction to entertain an action against the trustee in bankruptcy for specific performance, and it treats Dunlop's petition as an acceptance of the option and as the bringing of the suit in equity for specific performance. I am unable to find any provision in the bankruptcy law that gives any person a right of action for specific performance against the trustee in bankruptcy or that gives the court of bankruptcy jurisdiction of such a controversy. The bankruptcy law as amended in 1910 makes the trustee in bankruptcy an innocent purchaser and destroys root and branch all secret or unrecorded claims whether executed or executory. Baker was adjudicated a bankrupt on April 12th. Suppose that on May 1st, 18 days thereafter, he had executed a mortgage on the land in the hands of the trustee in bankruptcy, does any one suppose for a moment that the holder of such a mortgage could establish any claim whatever thereunder against the trustee in the court of bankruptcy?

As I have tried to show in the preceding paragraph, there was no contract the court of bankruptcy could deal with; but, in order to analyze futher the majority opinion of the court, let us assume that at the time of the adjudication there existed a valid contract between Baker and Dunlop, whereby Baker was bound to sell and Dunlop was bound to buy the land described in the contract. What would have been Dunlop's remedy or remedies?

At the common law there was no method of enforcing the specific performance of a contract. For its breach there was one remedy

only, and that was damages. The theory of the common law was that one shilling or sovereign was as good as another. It was therefore thought that, if the injured party was compensated in damages, he could secure the equivalent elsewhere. This theory was not in fact true, for a particular piece of land may have a peculiar and special value to a particular person, and its loss could not be compensated for by having money damages. Hence one of the early creations of equity was the doctrine of specific performance of contracts where the party had no adequate remedy at law. It was necessary to allege in the bill that the complainant was without adequate remedy at law, and that method of pleading still obtains. When the subject of the contract is realty, specific performance has come to be granted as a matter of course; but the right to specific performance is not and never has been an absolute, unqualified, unlimited right. The true doctrine is that specific performance rests in the sound judicial discretion of the chancellor.

In Rison v. Newberry, 90 Va. 519, 18 S. E. 918, the court, quoting Chancellor Kent, says:

"Specific performance cannot be considered a matter of right in either party, but is a matter of discretion in the court; not, indeed, of arbitrary and capricious discretion, depending upon the mere pleasure of the judges, but of that sound and reasonable discretion which governs itself as far as it may by general rules and principles, but which at the same time withholds or grants relief according to the circumstances of each particular case, when these rules and principles will not furnish any exact measure of justice between the parties."

The court, speaking for itself, says:

"If specific performance would work injustice, or be unreasonable, a party will be left to his action for damages."

On page 521 of 90 Va., on page 919 of 18 S. E., the court says:

"Specific performance is an equitable remedy, which compels the performance of a contract in the precise terms agreed upon or such a substantial performance as will do justice between the parties under the circumstances of the case. 22 Amer. & Eng. Enc. Law, p. 909. Bouvier defines it as the 'actual accomplishment of a contract by a party bound to fulfill it.'"

Mr. Justice Washington, speaking for the Supreme Court of the United States in Hunt v. Rhodes, 26 U. S. (1 Pet.) 14, 7 L. Ed. 27, says:

"Equity may compel parties to perform their agreements, when fairly entered into, according to their terms; but it has no power to make agreements for parties, and then compel them to execute the same. The former is a legitimate branch of its jurisdiction, and in its exercise highly beneficial to society; the latter is without its authority and the exercise of it would not only be an usurpation of power, but would be highly mischievous in its consequences."

Equity cannot make or alter a contract for the parties and then execute it. It may be stated as a general rule that a court of equity will not decree the specific performance of a contract beyond the ability of the defendant to perform, nor will specific performance of a contract be decreed where in the nature of things the only effect of the de-

cree would be to imprison the defendant perpetually. Equity will not decree the conveyance of property to which the defendant has no title. Where since a contract for the conveyance of property was executed the party has conveyed the property to an innocent third person, the prospective vendee is left to his action for damages. Amer. & Eng. Enc. Law, vol. 26, p. 37; Pom. Eq. §§ 293, 294.

In the case of Ford v. Euker, 86 Va. 76, 9 S. E. 500, the court held:

"Specific performance cannot be considered as a matter of right in either party. It does not proceed ex debito justitiæ, but is a matter of sound and reasonable discretion, which governs itself by general rules and principles, but withholds or grants relief according to the circumstances of each particular case, where these general rules and principles will not furnish any exact measure of justice between the parties. All applications to the court to decree specific performance must depend upon the circumstances of the case, governed by the established principles of the court. The contract must be clear and distinct. It must be mutual. If specific performance would work injustice, the party will be left to his action for damages. * * * If A. J. Ford, Jr., was not bound to buy, was Euker bound to convey? Can there be an agreement between two parties, which binds one of them absolutely and the other only at his pleasure? * * * Indeed, as equity is never bound to give this relief, so it never will unless the justice of the case, as drawn from all its facts, demands it."

Pomeroy's Equity Jurisprudence, § 837, says:

"If the vendor has disabled himself from performing after making the contract, * * * a court of equity will award damages to the vendee plaintiff, provided he commenced his suit in good faith, without any knowledge of the disability, but will not in general grant damages if this plaintiff was aware of the disability at the time of bringing his suit." Conrad v. Effinger, 87 Va. 59, 12 S. E. 2, 24 Am. St. Rep. 646; Click v. Green, 77 Va. 835; Threlkeld v. Fitzhugh, 2 Leigh [Va.] 456.

"The absolute inability of a defendant to perform his contract at all when called upon by the court to do so prevents a decree for specific performance, even though the defendant intentionally rendered himself unable to perform." Jones v. Tunis, 99 Va. 220, 37 S. E. 841.

"A decree for specific performance will not be granted against a defendant who is unable to perform the decree even though the inability were brought about by the defendant himself." Langford v. Taylor, 99 Va. 577, 39 S. E. 223; Hudson v. Land Co., 99 Va. 537, 39 S. E. 215.

The appellant's bill for specific performance never had any standing in the court. Specific performance could not be enforced. Baker had parted with the title. The decree of the court could not operate upon him. The action would not lie against the trustees. They were innocent purchasers. The act of 1898 gave the trustees no other or higher rights than the bankrupt had and the authorities cited by the appellant were under this act. The amendment of June, 1910 (Act June 25, 1910, c. 412, 36 Stat. 838), did give the trustees rights higher than the bankrupt had. The optionee admits in his supplemental petition that he could not have specific performance upon the terms mentioned in his option. He asked the court to do the thing it had no right to do, namely, to make another contract for the parties and enforce it, although Baker was not in a position to make the title.

The District Court has exercised its discretion. Whether it considered the price so grossly inadequate as to amount to fraud or op-

pression, or whether it considered that the dower rights of the bankrupt's wife would not be protected, or whether it considered that the conditions had so changed as to make the enforcement of the contract unconscionable, the decree does not state; but it refused specific performance, as well it might, upon any one or all of the grounds suggested. Now another serious situation confronts the appellant. Even if it was ever possible, after Baker parted with the title, to have specific performance, that question has now become academic, because the appellant has not preserved the rem. Specific performance can mean nothing more nor less than the conveyance of the land described in the option or some part thereof. The land has been sold. The court has no control over it or its present owners. If appellant desired to preserve the rem, he should have proceeded under section 1007 of the Revised Statutes (Comp. St. 1913, § 1666); but, not having taken his appeal within the 60 days, nor given nor attempted to give the supersedeas bond, the property has been sold, and his effort to have the court require it conveyed to him becomes impossible, and a mere moot question.

In the case of Wingert v. First National Bank of Hagerstown, 223 U. S. 670, 32 Sup. Ct. 391, 56 L. Ed. 605, where the effort was to enjoin the erection of a new building and while the case was pending in the court the building was erected, no supersedeas bond having been given, Mr. Justice Holmes delivered the opinion of the court, saying:

"It is enough to say that the whole case is disposed of by the erection of the new bank."

Mr. Justice Lurton, in the case of Richardson v. McChesney, 218 U. S. 487, 31 Sup. Ct. 43, 54 L. Ed. 1121, said:

"The thing sought to be prevented has been done, and cannot be undone by any judicial action. Under such circumstances, there is nothing but a moot case."

In the case of Mills v. Green, 159 U. S. 651, 16 Sup. Ct. 132, 40 L. Ed. 293, Mr. Justice Gray discussed at length the results which follow when, pending an appeal from the judgment of the lower court, an event occurs which precludes the relief prayed for in an appeal, and the conclusion of that case is that such an appeal will be dismissed. In the case of Title Guaranty & Surety Co. v. United States, 222 U. S. 401, 32 Sup. Ct. 168, 56 L. Ed. 248, Chief Justice White said:

"Although the writ of error was allowed, and was lodged in the office of the clerk more than 6 months after the entry of the judgment, the bond was approved to operate as a supersedeas. Under these circumstances it is apparent that the order for supersedeas was improvidently granted. No other conclusion is possible in view of paragraph 1007, Rev. Stat., making the allowance of a writ and the lodgment of the same in the office of the clerk within 60 days after the date of a judgment an essential prerequisite to the granting of a supersedeas."

It is said in the majority opinion that, although the land has been sold, the fund is in court, and that the fund takes the place of the land. Liens on land or property may be and often are transferred from the property to the proceeds thereof, for the purpose of the lien is to se-

cure the payment of the debt, and the debt can be paid and is paid in money; but it is idle to talk about a man's right to specific performance being transferred from a tract of land to the proceeds arising therefrom. That ignores the basic principle upon which the courts of equity invented the doctrine of specific performance, namely, that the old common-law doctrine of paying money did not afford adequate relief. The majority opinion goes further, and says that under the law of subrogation the appellant is entitled to the surplus after the payment of Baker's debts. This is not subrogation. The Court of Appeals of Virginia in Gatewood v. Gatewood, 75 Va. 411, said:

"Subrogation is * * * a very different thing from assignment. It is the act of the law and the creature of a court of equity, depending not upon contract, but upon the principles of equity and justice."

Subrogation is in fact the substitution of a new for an old creditor, and the court of equity keeps alive the lien or debt for the benefit of the party who made the payment. Subrogation provides reimbursement for the new creditor. The doctrine of subrogation has no application to the facts of this case. It is not claimed that Dunlop has paid any liens and is entitled to stand in the shoes of the former lienees. To say that Dunlop shall take the surplus fund after Baker's debts are paid is nothing less than giving the option all the force and effect of a legal title. An option is neither an assignment nor a conveyance. The purchase money not having been paid, it is not an equitable title. The breach of an option never gave but two remedies: One is an action for specific performance, and when specific performance becomes impossible, the court can do no more than give damages.

It is suggested in this case that once a court of equity has assumed jurisdiction, if it cannot grant him the relief he asked for, it will grant the complainant the relief he is entitled to. That is sound doctrine. It means only that a court of equity, having assumed jurisdiction of an action for specific performance and finding specific performance impossible, in order to prevent multiplicity of suits, will retain the suit and award such damages as complainant is entitled to. If Dunlop is given money, it must be as damages. The court cannot specifically perform, except by having the land conveyed to the vendee. Dunlop is not entitled to money as a creditor, nor in any capacity whatever, except by way of damages. The equity court, in ascertaining his damages, is governed by the same principles of law that a law court would be if the action had been brought at law for damages. Dunlop can secure nothing but sovereigns or shillings as damages for the breach of the contract.

This raises the very important question as to what is the measure of damages. In Stuart v. Pennis, 100 Va. 612, 42 S. E. 667, we find this syllabus:

"Growing trees are regarded in this state as real estate, and, in an action by a vendee against the vendor to recover damages for the breach of a contract for the sale and delivery of such trees, the measure of damages, according to the Virginia doctrine, is, as a general rule, the purchase money actually

paid, and interest thereon, and not the difference between the contract price and the market value at the time of the breach."

The court says:

"In Thompson v. Guthrie, 9 Leigh [Va.] 101 [33 Am. Dec. 225], following Stout v. Jackson, 2 Rand. [Va.] 132, Threlkeld v. Fitzhugh, 2 Leigh [Va.] 451, Mills v. Bell [3 Call, (Va.)] 320, and the leading English case of Flureau v. Thornhill, 2 Blacks. 1078, it is shown that the rule is as applicable to executory contracts as to those executed, and that the vendee is not entitled to more damages than the purchase money he has actually paid and interest thereon."

In Thompson's Ex'r v. Guthrie's Adm'r, 9 Leigh (Va.) 107, 33 Am. Dec. 225, the court said:

"In the case of actual eviction from land for which the purchaser has a conveyance, he can only recover the purchase money, with interest for such time as he is liable to be called on for rents and profits, and the costs of defending the title. This is the settled rule by which the damages are measured in cases of eviction under an executed contract, 'whether they be claimed in an action upon a warranty, or covenant of seisin, or of power to convey, or for quiet enjoyment.' See Stout v. Jackson, and Threlkeld's Adm'r v. Fitzhugh's Ex'x. The same rule applies, at least with equal force, to executory contracts for land. In Mills v. Bell, President Pendleton, who delivered the opinion of the court, seemed to think it applied a fortiori: for whilst he inclined to the opinion that, if a conveyance was made with warranty, the purchaser upon eviction was entitled on the covenant to the increased value of the estate, he declared that, as in that case the contract was executory, a court of equity would adjust the damages upon equitable principles, and accordingly he decreed the value at the time of the agreement. So in Flureau v. Thornhill, on covenant to convey a tract of land at a future time, which had increased in value, and the vendor had no clear title, the vendee was only allowed the purchase money and interest, for that was his real loss. And Judge Green, in Stout v. Jackson, says that 'in all cases of executory contracts, the compensation in case of failure, when the property sold has in the meantime increased in value, should be the same as in case of an executed contract with warranty, and an eviction; for the real loss to the purchaser is the same.' Judge Cabell, too, in the case of Threlkeld's Adm'r v. Fitzhugh's Ex'x, draws the distinction between contracts to deliver personal property and contracts to convey lands at a future period in these words: 'In all executory contracts for the delivery of personal property at a future day, the established standard of damages is the value of the property at the time and place when and where it ought to be delivered. In all executory contracts for the conveyance of land at a future time, the established measure of damages is the purchase money.' On a covenant to make a good title, where there is no fraud on the part of the vendor, and he sells believing his title to be a good one, or that it can be made so, the rule must be the same. The vendee's loss, in case of failure, is the purchase money; the profits, as long as he receives them, standing in lieu of interest, unless so far as they are recovered. For this loss he ought to be compensated, if the land falls in value; and no more than compensated, if it rises."

Wilson v. Spencer, 11 Leigh, 261, lays down the only exception to this well-established rule in Virginia:

"Though in general, for the breach of an executory contract to convey land, the vendee is not entitled to more damages than the purchase money he has actually paid, and interest thereon, * * * yet this rule will not be applied where the fraudulent conduct of the vendor makes it unreasonable to limit the vendee to that measure of damages. If, for example, a vendor who has the title in him at the time of sale shall, after his contract disable him-

self to perform it by conveying the land to another, he will be held liable for the value at the time of the breach."

This court certainly would not hold that a person by going into bankruptcy committed a fraud upon anybody. In this Baker had prepared his petition and schedules in voluntary bankruptcy, had signed them and sworn to them, and left them in the hands of his attorney for filing before the option was executed, and Dunlop was advised of that fact. There is nothing to take this case out of the general rule. Wherefore it follows that the real consideration for the option becomes an important question, as such consideration constitutes the whole measure of damages Dunlop is entitled to, as it is conceded that he has paid no part of the purchase money and all he is out is what he paid, if anything, for the option. It is not difficult to understand why Dunlop is not willing to establish his damages at law or under section 63b of the Bankruptcy Act. If damages are assessed under the general rule, the amount paid for the option, with interest thereon, will be the measure of damages.

The option ought to be declared void because it was made in violation of the law designed to prevent the desecration of the Lord's Day. Section 3799 of the Code of Virginia is as follows:

"If a person on the Sabbath day be found laboring at any trade or calling, or employ his apprentices or servants in labor or other business except in household or other work of necessity or charity, he shall be deemed guilty of a misdemeanor. * * *"

Section 3800:

"The forfeiture, declared by the preceding section, shall not be incurred by any person who conscientiously believes that the seventh day of the week ought to be observed as a Sabbath, and actually refrains from all secular business and labor on that day, provided he does not compel an apprentice or servant, not of his belief, to do secular work or business on a Sunday, and does not on that day disturb any other person."

The statute of 29 Charles II, chapter 7, section 3, enacts:

"No tradesman, artificer, workman, laborer, or other person whatsoever shall do or exercise any worldly labor, business or work of their ordinary calling upon the Lord's Day or any part thereof, works of necessity and charity only excepted."

Under this statute it has been held that a contract made on Sunday was not void, unless it was within the calling or trade of one of the parties. The Virginia statute is more comprehensive. The Virginia statute applies if the work is done in any trade or calling, whether one's own or another's, and whether the work is ordinary or extraordinary. Buying and selling real estate is a business or calling, and is as much a desecration of the Sabbath as the buying and selling of merchandise. The only evidence in this record as to the calling of the optionee is that, during April and May, 1915, he was securing options of land in the vicinity in which Baker lived. The Court of Appeals of Virginia has never had occasion to decide whether or not a contract made on Sunday is void, but that court in the case of Camp v. Bruce, 96 Va. 521, 31 S. E. 901, 43 L. R. A. 146, 70 Am. St. Rep. 873, said:

"The law refuses to enforce illegal contracts as a rule, not out of regard for the party objecting, nor for any wish to protect his interests, but from reasons of public policy. Whenever, therefore, the illegality of the contract appears, whether alleged in the pleadings or made known for the first time in the evidence, it is fatal to the case. That defect cannot be gotten rid of either by a failure to plead it or by agreeing to waive it in the most solemn manner. The law will not enforce contracts founded in its violation."

In the case of Levy v. Davis, 115 Va. 814, 80 S. E. 791, the court said:

"It is a well-settled principle of law that the courts will not aid a party to enforce an agreement for the furtherance of objects forbidden by the statute, or by common law, or general policy of law, or to recover damages for its breach, or when the agreement has been executed in whole or in part by payment of money to recover it back."

And again:

"If the parties are equally at fault, the law will leave them where it finds them. The rule is the same in equity."

To hold that contracts made on Sunday are in violation of the statutes of Virginia and are void is to respect the Christianity and the civilization and the wise public policy underlying the statute. The court should so hold.