JULIUS FORSTMANN and Another, Appellants, *v.* JORAY HOLDING COMPANY, INC., and Another, Respondents.

First Department, March 19, 1926.

Deeds — restrictive covenants — property in question was leased by individual defendant to corporation defendant subject to restriction against any building except one-family residence — restriction applied to entire block — corporation defendant, though advised about restriction and plaintiffs' attitude, proceeded to violate covenant by starting construction of building to be used for stores and offices — fact that business may have become predominant in immediate neighborhood does not render covenant ineffective — house owned by plaintiffs under lease to doctor not violation — wall maintained by plaintiffs not violation — corporation defendant could not prevent injunction by proceeding with building before action could be tried — fact that covenant expires in 1929 and that restricted block has been placed in business district does not deprive plaintiffs of injunction — injunction granted.

The plaintiffs are entitled to an injunction restraining the defendant corporation from erecting a business building in the block in which plaintiffs' residence is located, since it appears that all the property in that block is subject to a restrictive covenant prohibiting the erection of any building except a dwelling house for a single family; that defendant corporation leased the property in question from the individual defendant subject to the restriction; that notwithstanding the restriction was known to the corporation defendant, and notwithstanding that the plaintiffs protested against the erection of the building, the corporation defendant nevertheless commenced the erection of a building in violation of the covenant prior to the commencement of this action; and that there was some evidence that the district in the immediate vicinity of the block had become more or less a business district.

Even though the immediate neighborhood of the block in question has become a business district, nevertheless the restrictive covenant is not rendered ineffective as to the block in question, for it is evident that the restriction was placed on the property for the very purpose of preventing any part of the block from being devoted to business buildings.

A violation of the restriction by the plaintiffs is not shown by the fact that they own a house within the restricted block subject to a lease to a doctor who occupies the house as his residence and who has associated with him two other doctors who do not pay any money rent for their offices but assist him from time to time in his work, for the house in question has not been altered for business purposes and has every appearance of a single family house.

Plaintiffs have not violated the restriction by maintaining a wall projecting from the residence occupied by the doctor, since it appears that the property was in that condition when purchased by the plaintiffs, and that they have removed the upper four feet of the wall so as to bring it within the limit of the restrictive covenant.

It was not necessary for the plaintiffs to procure an injunction *pendente lite* and the defendant corporation could not defeat plaintiffs' right to a permanent injunction by the fact that it commenced the erection of its building in violation of the restriction and over plaintiffs' protest before the plaintiffs instituted the present

action. The fact that said defendant has partially erected its building will not deprive the plaintiffs of their right to an injunction.

The fact that the restrictive covenant expires in 1929 and that in 1916 the board of estimate and apportionment established a business district embracing the block in question does not deprive the plaintiffs of their right to enforce the restriction.

MERRELL, J., dissents, with opinion.

APPEAL by the plaintiffs, Julius Forstmann and another, from a judgment of the Supreme Court in favor of the defendants, entered in the office of the clerk of the county of New York on the 18th day of June, 1925, upon the decision of the court rendered after a trial at the New York Special Term.

*Cohen, Gutman & Richter* [*Julius Henry Cohen* of counsel; *Theodore B. Richter* with him on the brief], for the appellants.

*Kellogg & Rose* [*Abram J. Rose* of counsel; *William K. Hartpence* with him on the brief], for the respondent Joray Holding Company, Inc.

*Babbage & Sanders* [*John Burlinson Coleman* of counsel], for the respondent Edward R. Finch.

McAVOY, J. The very important question to resident owners of real property in Manhattan is presented on this appeal — whether or not there is any protection to the privacy of a residence block against the encroachment of business buildings therein in violation of an express covenant forbidding the permitting of the use of the land for any purpose except for a building used as a " dwelling house for a single family? " It is a futile argument in justification of nullifying this covenant to say that the neighborhood has changed in character, since the restriction was imposed not to govern a general neighborhood improvement, but was so obviously designed as a block restriction only, as not to need argument to support that view of its purport. The facts, which were uncontested but not found in the formal decision at Special Term, demonstrate that the conclusion below that plaintiffs are not entitled to any relief for this invasion of their privacy is so erroneous as to require reversal on fact and law. A summary of the history of the controversy follows:

For many years prior to 1907 the New York Public Library was the owner of the whole square block bounded by Fifth and Madison avenues, Seventieth and Seventy-first streets. It first sold the westerly portion of the block, consisting of the entire Fifth avenue frontage, running back 175 feet. This plot is occupied by the Frick Mansion. Thereafter when the library disposed of the parcels within the easterly half of the block it imposed upon this latter area the following restrictions:

" The said party hereto of the second part, for him (her) self, his (her) heirs and assigns, hereby covenants and agrees to and with the said party of the first part, its successors or assigns, that neither he (she) nor his (her) heirs or assigns, shall or will at any time prior to the first day of January, Nineteen hundred and twenty-nine (1929) erect or permit upon the above granted premises, or any part thereof, any building, except a dwelling house for a single family, and further that neither he (she) nor his (her) heirs or assigns, shall or will at any time prior to the said first day of January, Nineteen hundred and twenty-nine (1929) erect or permit upon the above granted premises any such building, or any other structure, or any extension thereof, or projection therefrom (except partition walls or fences not exceeding twelve feet in height) within ten feet of a vertical plane passing through the centre line of the block between Seventieth and Seventy-first Streets."

Following the imposition of the restriction a group of dwelling houses was erected on the block in conformity with the restrictions. The photographic exhibits testify to the high-class character of these residences.

In 1922 the plaintiffs purchased a plot within the restricted area, on the south side of Seventy-first street, adjoining the corner of Madison avenue, having a frontage of forty-five feet, on which they erected the residence in which they now live. The plaintiffs later bought for their protection the adjoining property situated at the southwest corner of Madison avenue and Seventy-first street, subject to a lease to a Dr. Frederick Tilney.

On March 3, 1924, the defendant Finch purchased the plot located at the northwest corner of Seventieth street and Madison avenue, within the restricted area. The deed to him conveyed the property subject to the restriction. On July 1, 1924, he leased this plot to the defendant Joray Holding Company, Inc., subject to the same restrictive covenant. But nevertheless by this lease the tenant was bound to erect a building to be used for stores and offices and the owner in turn agreed to advance part of the cost. The owner, in the lease, also assumed the defense of any action brought to enforce the restriction and waived his rent during the continuance of any injunction against the operation.

The court below found that at the time the restrictions were placed on the property, Madison avenue, in that vicinity, was a private residential neighborhood and that at the time of the commencement of this action, and at the present time, it is entirely a business district.

There is testimony on behalf of defendants that at the time the restrictions were placed on the property the neighborhood was a

very fine residential one, and that on Madison avenue the nearest business place to the north of the property was Cassebeer's drug store, located at the southeast corner of Seventy-fifth street, and that the nearest business place to the south was at Sixty-second or Sixty-third street.

The plaintiff's uncontradicted proof shows that north of Fifty-ninth street and up to Eighty-sixth street along Madison avenue very many properties at that time were occupied for business purposes.

The case of *Korn* v. *Campbell* (119 App. Div. 401; affd., 192 N. Y. 490), involving property at Seventy-third street and Madison avenue, demonstrates that it was the desire of the owner of that property at that time to make alterations so that his building might be used for business purposes, and further that as early as 1906 business was already feeling its way into Madison avenue in the vicinity of the seventies, and that Madison avenue at the time of the creation of the restrictions here sought to be enforced was not strictly residential. Thus it would seem to be clear that it was the desire of those interested in the block here affected to restrict its particular territory to dwellings for the duration of the restrictive period.

The court below found that the plaintiffs' premises, at the southwest corner of Madison avenue and Seventy-first street, " was and is not used or occupied as a dwelling house for a single family, but on the contrary was and is occupied and used by three physicians, to wit: Dr. Tilney, Dr. Howe and Dr. Riley, for the treatment of their patients and the carrying on of their business, one of whom resides with his family and his nephew on the said premises and the other two of whom reside elsewhere and merely have their offices on the said premises."

The building at the southwest corner of Madison avenue and Seventy-first street is, as the photograph thereof indicates, a private residence. It has not been changed one iota in its external aspect. This building was acquired by plaintiffs subject to Dr. Tilney's lease. On the ground floor of that house are a waiting room and a secretary's room, the kitchen and laundry. On the next floor are the drawing room, dining room and butler's pantry. The fourth floor and the top floor are devoted to the living quarters of the family and of the servants. The doctor's practice is conducted on the third floor. The doctor testified that in the suite of offices which takes up the entire third floor of the house he occupied one room as his consulting room, the second room was used as the examining room, the third room was used as another examining room, the fourth room was used by Dr. Riley and Dr. Howe as an

office, and the fifth room was used for his secretaries.  No patients are ever housed in the building or kept there for observation.  Dr. Howe and Dr. Riley pay Dr. Tilney no rent and no monetary consideration passes between them.  The privilege of making full charges for the patients whom they treat compensates Dr. Riley and Dr. Howe for the association and for the assistance they render to Dr. Tilney.

In *Smith* v. *Graham* (161 App. Div. 803; affd., on the opinion below, 217 N. Y. 655) it was said: " But it would seem to be true that a dwelling, so long as it is used as such, may be also used as a place for carrying on some kinds of business provided such business is of such character as to be no inconvenience to neighboring property holders.  As is suggested in *Dorr* v. *Harrahan* (101 Mass. 531), such a house ' might be occupied by a physician, or a lawyer, perhaps by a chemist or photographer, and a portion of it set apart as an office or place of business without any offence or objection.  All this would be allowable under the deed.'  *  *  * "

In *Smith* v. *Scoville* (205 App. Div. 112), decided by this court in April, 1923, before the purchase of this property, it was held that the conduct of a boarding house business did not violate a restriction providing that no building should be erected excepting " first class dwelling houses " and that no " trade or business " whatsoever should be conducted on the premises.  In the opinion in that case the opinion of the Fourth Department in *Smith* v. *Graham* (161 App. Div. 803; affd., 217 N. Y. 655) is quoted, as follows: " But it would seem to be true that a dwelling, so long as it is used as such, may be also used as a place for carrying on some kinds of business provided such business is of such character as to be no inconvenience to neighboring property holders."

And in *Iselin* v. *Flynn* (90 Misc. 164), an action brought to restrain the conduct of a dressmaking establishment on premises affected by a restrictive covenant confining the premises to first-class dwelling houses, injunctive relief was resisted on the ground that the presence of physicians on the block practicing their professions in their homes changed the character of the occupancy from residence to business.  There it was said: " A number of physicians eminent in their profession have taken up residence in the street, and it is claimed that they in fact conduct business which has consequential effects upon the neighborhood.  It is not necessary to enter upon an ethical discussion of the difference between a livelihood gained by the practice of a profession and that by a business vocation.  The law is practical.  It is not concerned with abstractions, but with the actual affairs of men,

and it recognizes the distinction between the practice of a profession and the conduct of a mercantile business. One is purely personal, depending upon the skill or art of the individual. The other may consist in ability to organize and manage a shop or exchange where commodities are bought or sold. Neither the spirit nor the letter of the restrictive covenant intended or expressed prohibition of the practice of a profession, nor can sophistry pervert the real intent and plain meaning of the word ' business ' to include ' profession.' ''

In the case of *Booth* v. *Knipe* (225 N. Y. 390), which the respondents say is directly in point, the Court of Appeals said (p. 397): '' We cannot doubt that the attempted use is a breach of the restriction. The lease provides that the building shall be ' occupied as a sanatorium and not otherwise.' The evidence makes it clear that it is used as a maternity hospital. By no stretch of language can we say that this is equivalent to use ' as a private residence for one family.' '' A perversion of analogy would result from attempting to hold these cases even approximately similar.

Much is made of the fact that at the time of the commencement of the action the plaintiffs were maintaining a wall projecting from their building located at the southwest corner of Madison avenue and Seventy-first street, about sixteen feet high. It should be borne in mind that this was the condition when the plaintiffs acquired the corner to protect their home, and that in the early part of March, 1925, they removed the upper four feet of this wall, so as to bring it within the limit of the restriction, and this was the condition at the time of trial at which period equity finds its facts and molds its decree.

The plaintiffs herein did not move for an injunction *pendente lite.* There is testimony, however, that as soon as plaintiffs learned of the situation, the matter was taken up with the defendant Finch, in the effort to arrive at an amicable settlement. When negotiation failed this action was immediately brought. The defendants proceeded with their structure heedless of plaintiffs' protest. Plaintiffs justifiedly state there was no occasion for the defendants' unseemly haste. If unwilling to await this action, they could themselves have brought an action for a declaratory judgment as to their rights and duties (Civ. Prac. Act, § 473; Rules Civ. Prac. rules 210–214) before commencing their building operation, *prima facie* a breach of a solemn covenant. Certainly they do not, through their precipitate conduct in forestalling legal action, create an equity in their favor. The notion that a defendant warned against a threatened violation, can obtain immunity from an injunction by paying no attention to the

warning, is unsound in law. Litigants cannot with impunity thus race with the court's process. If speed fortifies a defendant's position in law, all a defendant has to do to escape an injunction is to outstrip the court's process in point of time. A decent regard for the orderly determination of the rights of the litigants forbids the acceptance of such doctrine.

We find that nothing could be less doubtful than that when the restriction was created, it was desired to maintain this particular block as one for private dwellings only. If independent or original judgment was controlling, it would be restrained by our own ruling in *Pagenstecher* v. *Carlson* (146 App. Div. 738, 1st Dept. 1911). The plaintiff in that case owned three houses on the south side of West Fortieth street, between Fifth and Sixth avenues, being Nos. 48, 50 and 52. The defendant owned No. 38 West Fortieth street. The restriction affecting these properties was imposed in 1871 upon the holding of a partition sale of about half of the block on the south side of West Fortieth street. The restriction confined the property to private dwelling houses. The defendant threatened to alter her house for business purposes. In rejecting the defendant's contention that the invasion of business in this district entitled her to alter her building for business purposes in defiance of the restriction, this court, through Mr. Justice MILLER, said: " While it is quite true that the current of business has reached the restricted territory, that of itself does not afford ground for denying equitable relief, for, as was said by DANFORTH, J., in *Trustees of Columbia College* v. *Thacher* (87 N. Y. 311, 319), it is apparent that such encroachment was anticipated. It cannot be said that the encroachments of business have made the property undesirable for private residences. A fine public building and a park occupy the block on the north side of Fortieth street. The plaintiff says that she wishes to enjoy her property as a private residence. When she purchased it she had a right to rely upon the assumption that the encroachment of business would be stopped at the line of the restricted territory, and, in our judgment, it is no answer to her claim for equitable relief that the property may be worth more for business purposes. The defendant bought knowing, or chargeable with knowledge of, the restrictive covenant. \* \* \* If the further encroachment of business on the block be prevented, the plaintiff's premises may remain desirable for residence purposes, and it cannot be said, therefore, that the enforcement of the covenant will harm the defendant without conferring any substantial benefit on the plaintiff."

The respondents urge as factors in their favor the fact that the restriction has to run to 1929 only, and the further fact that in

1916 the board of estimate established a business district embracing the location in question. While these are elements which were doubtless considered in the purchase of this corner property, yet they were not destructive of plaintiffs' or the other covenantees' privileges, and the purchaser cannot be heard now to claim that he is injured by the enforcement of the restriction. Since he entered the matter apprised of the protest of his neighbor and concluded the restriction was no longer binding, he accepted the hazard. That the result would be adverse to his view was inevitable if the terms of a covenant are to continue to have judicial sanction.

The judgment appealed from should be reversed, with costs, and judgment entered in favor of the plaintiffs for the relief asked for, with costs.

DOWLING and MARTIN, JJ., concur; MERRELL, J., dissents.

MERRELL, J. (dissenting). The action was brought to obtain a mandatory injunction requiring the defendants to remove a two-story business building erected by the defendant Joray Holding Company, Inc., on real property on the northwest corner of Madison avenue and Seventieth street in the borough of Manhattan, New York city, owned by the defendant Edward R. Finch. The building sought to be removed is a new one, erected since July 1, 1924, when the real property in question was leased by defendant Finch to the defendant Joray Holding Company, Inc. The building was erected at a cost of between $43,000 and $44,000. The plaintiffs in the action seek to compel the removal of said building by virtue of a restrictive covenant contained in a prior deed conveying said premises and subject to which the defendant Finch took title. The restriction expires on December 31, 1928, having, therefore, less than two years and ten months still to run, after which time the premises may be devoted to such uses as the owners thereof may see fit. The covenant in question forbade the erection upon the said real property of any building, except a private dwelling house for a single family. No application was made herein for a temporary injunction *pendente lite*. At the close of the trial, upon the evidence presented, the court directed judgment in favor of the defendants, dismissing the plaintiffs' complaint. The deed under which the defendant Finch holds title to the property in question is subject to the following restrictive covenant:

" The said party hereto of the second part, for him (her) self, his (her) heirs and assigns, hereby covenants and agrees to and with the said party of the first part, its successors or assigns, that

neither he (she) nor his (her) heirs or assigns, shall or will *at any time prior to the first day of January, Nineteen hundred and twenty-nine (1929) erect or permit* upon the above granted premises, or any part thereof, *any building, except a dwelling house for a single family,* and further that neither he (she) nor his (her) heirs or assigns, shall or will at any time prior to the said first day of January, Nineteen hundred and twenty-nine (1929) erect or permit upon the above granted premises any such building, or any other structure, or any extension thereof, or projection therefrom (except partition walls or fences not exceeding twelve feet in height) within ten feet of a vertical plane passing through the centre line of the block between Seventieth and Seventy-first Streets." (Italics are the writer's.)

The defendant Finch acquired said property by deed bearing date March 3, 1924, and on July first following he leased the plot to the defendant Joray Holding Company, Inc., which erected thereon, during the summer of 1924, a substantial business building, built of whitestone, two stories in height. If the aforesaid restrictive covenant was in force at the time title to the real property passed to the defendant Finch and at the time of the erection of the business building thereon by the defendant Joray Holding Company, Inc., and no other elements entered into the question, then the plaintiffs should have received the equitable relief for which they prayed.

Two defenses were interposed by the defendants at the trial: *First,* it was the contention of the defendants that in 1907, when the restriction was placed upon the property, the neighborhood was a residential one, there being in that vicinity only an occasional and widely separated business establishment, but that since 1907 the character of the neighborhood had radically changed, and that at the time of the commencement of the action business establishments had taken possession and the neighborhood was one devoted almost exclusively to business. The *second* defense interposed was that the plaintiffs themselves did not come into court with clean hands, and that they had and still were openly violating the very covenant which they seek to enforce. The Special Term held with the defendants and denied the plaintiffs injunctive relief.

The block in question, bounded on the west by Fifth avenue; on the south by Seventieth street; on the east by Madison avenue, and on the north by Seventy-first street, was for many years prior to 1907 owned by the New York Public Library. The library first sold the westerly portion of the block lying along Fifth avenue and extending back 175 feet. This plot comprised a little less

than half the entire block, and was sold by the public library without restriction. In 1907 a plan was formulated to restrict the easterly portion of the block, and thereafter, when it disposed of various portions of the property remaining, it did so by deeds containing or subject to the same restrictive covenant as that hereinbefore mentioned. In 1916 the board of estimate and apportionment of the city of New York adopted a resolution, known as the Building Zone Resolution, under the provisions of which both the east and west sides of Madison avenue for a distance of 100 feet from each side of the avenue from Fortieth street to One Hundred and Twentieth street were established as a business district, and from that time to the present, under said resolution, said territory has been established as a business district. On May 5, 1922, the board of estimate and apportionment adopted a resolution providing for the widening of Madison avenue from Sixtieth to Seventy-second streets with a view of providing for the increased business traffic on the avenue. In February, 1922, the plaintiffs purchased a plot within the restricted area on the south side of Seventy-first street, 45 feet in width and with a depth of 100 feet 5 inches. On this plot the plaintiffs erected a residence wherein they now reside. Later on the plaintiffs bought the building occupying the southwest corner of Madison avenue and Seventy-first street, which building was then and is still occupied, as the respondents claim, contrary to the restrictive covenant, by three physicians for business purposes. The defendant Finch purchased the lot in question on March 3, 1924, and, as before stated, on July 1, 1924, he leased said plot to the defendant Joray Holding Company, Inc. At the time the premises in question were conveyed to the defendant Finch the neighborhood outside the block upon which the property was situated was occupied almost exclusively by business buildings.

In substantiation of their first defense, the defendants sought to show that since the time when said restrictions were imposed the use of the property in the neighborhood had radically changed. The defendant Finch testified that in 1907, when the restrictions were first placed upon the property, the neighborhood was a fine residential one, and that at that time the nearest place of business to the north of the property in question was a drug store located at the southeast corner of Seventy-fifth street, and that the nearest place of business on Madison avenue to the south was in the vicinity of Fifty-ninth street. The defendant Finch further testified that at the time he purchased the property every property in practically the entire length of Madison avenue in that vicinity had been given over to business. A large number of photographs

were introduced in evidence showing that both to the north and
south of the property in question Madison avenue is at present
practically devoted to business enterprises.   The defendants also
swore three expert real estate witnesses, all of whom corroborated
substantially the testimony given by the defendant Finch that
at the time of the imposition of the restrictive covenant concerning
the block in question the neighborhood was almost exclusively a
residential one, and that at the time of the trial there had been
a radical change and that real property in that neighborhood was
then almost exclusively used for business purposes.   From an
examination of the record, I do not think the testimony of the
defendant Finch and the expert witnesses sworn in behalf of the
defendants was seriously controverted.   Indeed, the single real
estate expert offered as a witness in behalf of the plaintiffs testified
upon cross-examination that the only business carried on in 1907
on either side of Madison avenue from Sixty-fourth to Seventy-fifth
streets was a store at the southeast corner of Sixty-ninth street,
a cleaning establishment between Seventy-fourth and Seventy-fifth
streets, and the drug shop at the southeast corner of Seventy-fifth
street.   The prevailing opinion asserts that " The plaintiffs'
uncontradicted proof shows that north of Fifty-ninth street and
up to Eighty-sixth street along Madison avenue very many prop-
erties at that time were occupied for business purposes."

I assume, by the words " at that time " the writer refers to
the time when the restrictive covenant was imposed in 1907.   As
I read the record, the above-quoted statement is unsupported by
the evidence.   I find no proof on the part of the plaintiffs that
*in 1907*, when the restriction was first imposed, there were any
properties along Madison avenue to the north in the vicinity of
the restricted area occupied for business purposes, save the Cassebeer
chemist shop, at the southeast corner of Seventy-fifth street, and
the cleaning establishment between Seventy-fourth and Seventy-
fifth streets, and a store at the southeast corner of Sixty-ninth
street, to the south.   The defendant Finch and his three real
estate witnesses all testified from actual recollection of the con-
ditions existing in 1907.   The plaintiffs produced but one witness,
Everett A. Brett, who attempted to testify as to the conditions
in 1907.   An examination of Brett's testimony shows it to be
most indefinite and of little probative value.   This witness, on his
direct examination, in response to leading questions by counsel
for the plaintiffs, gave some very nebulous testimony as to the
character of the neighborhood with reference to the " period from
1907 to 1910 "— a period extending three years beyond the time

of the imposition of the restriction. The examination of this sole witness of the plaintiffs concerning this vital matter reveals his uncertain knowledge of the conditions existing in 1907. On cross-examination Brett was asked: " Q. My question is whether, in 1907, there was any business place on either side of Madison Avenue between 64th Street and 65th Street, that you know of of your own knowledge? A. I don't recollect any between those streets. Q. In the year 1907, do you know of any business place on either side of Madison Avenue, of your own personal knowledge, between 65th Street and 66th Street? A. I believe there was a school between 65th and 66th Streets at that time — the Cutler School, but I am not positive as to whether it was back as far as 1907. Q. My question was if you knew of your own knowledge that in 1907 there was any business place there? A. No, I would not say that I do. * * * Q. Similarly, in 1907, do you know of your own knowledge of any business place on either side of Madison Avenue between 67th Street and 68th Street? A. No, I don't think I do recall any. Q. In 1907, do you know of your own knowledge of any business place on either side of Madison Avenue between 68th Street and 69th Street? A. The southeast corner of 69th Street had a store there I think in 1907, or it may have been before. I recollect there was a store there at that time. Q. In the year 1907, do you know of your own knowledge whether there was any business place between 69th Street and 70th Street on Madison Avenue? A. No, I don't recall that there was any. Q. Do you know whether there was any business place between 70th Street and 75th Street on Madison Avenue in 1907. A. There was not. Q. Was there any business place between 71st Street and 72nd Street, on either side of Madison Avenue in 1907? A. No; I don't recall any there. Q. Do you recall any business place that you knew of of your own knowledge between 72nd Street and 73rd Street on either side of Madison Avenue in 1907? A. I do not. Q. Similarly between 73rd Street and 74th Street, on either side of Madison Avenue in 1907, do you recall any business place? A. Yes. That was the Campbell house at the northwest corner. Q. There was a store at the northwest corner of 73rd Street? A. Yes. Q. What kind of a store was that? A. That was an alteration from a dwelling house. Q. Occupied by what kind of a business? A. I don't think there was any occupancy there then, because my recollection is that the alterations had stopped because of the court proceeding. Q. And there was no business being carried on there? A. I don't think there was any business in the building. Q. Was there any other business being carried on at that time, to your knowledge, between 73rd

Street and 74th Street, on either side of Madison Avenue? A. No, I don't recall any. Q. Between 74th and 75th Streets, to your knowledge, what business, being carried on in 1907? A. Bryant's cleaning establishment was in there. Q. And that was the only one? A. At the southeast corner was Cassebeer's drug store. Q. Those are the only ones? A. The only ones that I recall."

The foregoing excerpt from the testimony of plaintiffs' sole witness on that subject, short of showing that "plaintiffs' uncontradicted proof" was that at that time there were "very many properties" occupied for business purposes, corroborates the testimony of the defendant Finch and his witnesses that in 1907 there were only two or three widely-separated business establishments on Madison avenue from Sixty-fourth street to Seventy-fifth street. It is significant that the inquiries on the direct examination of the witness Brett were not as to conditions in 1907, but were with reference to "the period from 1907 to 1910." In this rapidly-changing city, where the character of a neighborhood is altered from a residential to a business one almost overnight, it would be likely that three years after the covenant was imposed conditions had changed. It is easy to say, in the light of succeeding events, that when the restriction was imposed the owner of the block foresaw the impending advance of business upon Madison avenue, but the record, in my opinion, shows nothing to justify such an apprehension in 1907. At the time the restriction was imposed, the locality was a residential one. The appellants make much of the assumption that at the time the covenant was imposed the immediate locality was in process of changing from a residential to a business one — an assumption, as I have shown, unsupported by the evidence — and that the restriction was imposed with that end in view, and upon such erroneous assumption they base their answer to defendants' claim that the changed conditions were sufficient to destroy the efficacy of the covenant. The facts destroy the plaintiffs' claim in this respect. The court found upon the testimony that at the time the restrictions were placed upon the property Madison avenue, in the vicinity of defendants' plot, was a private residential neighborhood, and that at the time of the commencement of the action it had entirely changed into a business neighborhood. I think the finding of the trial court in this respect was amply supported by the evidence, and was not contrary to the weight thereof. The law is reasonably well settled that equity should not interfere to enforce by its peculiar mandate restrictive covenants limiting property to original purposes where there has been a change in the character of the neighborhood since the restriction was imposed from a residential to a business one.

(*Trustees of Columbia College* v. *Thacher*, 87 N. Y. 311; *McClure* v. *Leaycraft*, 183 id. 36.) It was held in the case last cited that a court of equity would not grant a permanent injunction enforcing a covenant running with the land against the erection thereon of any buildings except brick or stone dwelling houses or any tenement house or community house, where it appears that nineteen of the twenty-five years which bounded the life of the covenant had passed and that the object of the parties in making the covenant had been defeated by the erection of stores and apartment houses in the vicinity by persons not under the control of the defendant, so that enforcement of the covenant could not restore the neighborhood to its former condition and make it desirable for private residences; that an injunction bearing heavily on the defendant without benefiting the plaintiff would always be withheld as oppressive; that any damages which might be sustained might be recovered in an action at law. In writing for the unanimous Court of Appeals in *McClure* v. *Leaycraft* (*supra*), Judge VANN said (at p. 44): " Nineteen of the twenty-five years which bounded the life of the covenant in question have passed, and the object of the parties in making it has been defeated by the unexpected action of persons not under the control of the defendant. Under the circumstances now existing the covenant is no longer effective for the purpose in view by the parties when they made it, and the enforcement thereof cannot restore the neighborhood to its former condition by making it desirable for private residences. If the building restriction were of substantial value to the dominant estate, a court of equity might enforce it even if the result would be a serious injury to the servient estate, but it will not extend its strong arm to harm one party without helping the other, for that would be unjust. An injunction that bears heavily on the defendant without benefiting the plaintiff will always be withheld as oppressive. No injustice is done, for the damages sustained can be recovered in an action at law, and the material change of circumstances so affects the interests of the parties as to make that remedy just to both."

In the case at bar the restrictions were placed upon the property in 1907. They expire on December 31, 1928. Over nineteen of the twenty-two years when the restrictions were enforcible have passed. Less than two years and ten months remain when such restrictions in any event may be enforced. The Court of Appeals in *Batchelor* v. *Hinkle* (210 N. Y. 243) followed its decision in *McClure* v. *Leaycraft* (*supra*). In the case of *Trustees of Columbia College* v. *Thacher* (87 N. Y. 311) Judge DANFORTH, writing for the Court of Appeals, said (at p. 317): " It certainly is not the doctrine of courts of equity, to enforce, by its peculiar mandate, every contract,

in all cases, even where specific execution is found to be its legal intention and effect. It gives or withholds such decree according to its discretion, in view of the circumstances of the case, and the plaintiff's prayer for relief is not answered, where, under those circumstances, the relief he seeks would be inequitable. (*Peters* v. *Delaplaine*, 49 N. Y. 362; *Margraf* v. *Muir*, 57 id. 155; *Mathews* v. *Terwilliger*, 3 Barb. 51; *Radcliffe* v. *Warrington*, 12 Vesey, 331.) If for any reason, therefore, not referable to the defendant, an enforcement of the covenant would defeat either of the ends contemplated by the parties, a court of equity might well refuse to interfere, or if in fact the condition of the property by which the premises are surrounded has been so altered ' that the terms and restrictions ' of the covenant are no longer applicable to the existing state of things. (1 Story's Eq. Jur. [10th ed.] § 750.) And so though the contract was fair and just when made, the interference of the court should be denied, if subsequent events have made performance by the defendant so onerous, that its enforcement would impose great hardship upon him, and cause little or no benefit to the plaintiff. (*Willard* v. *Tayloe*, 8 Wall. 557; *Thomson* v. *Harcourt*, case 66, p. 415, vol. 2, Brown's Parliamentary Reports; *Davis* v. *Hone*, 2 Sch. & Lef. 341; *Baily* v. *DeCrespigny*, L. R., 4 Q. B. 180; *Clarke* v. *Rochester, Lockport & Niagara Falls Railroad Company*, 18 Barb. 350.) " And further (at p. 319), continues: " In the case before us, the plaintiffs rely upon no circumstance of equity, but put their claim to relief upon the covenant and the violation of its conditions by the defendant. They have established, by their complaint and proof, a clear legal cause of action. If damages have been sustained, they must, in any proper action, be allowed. But on the other hand, the defendant has exhibited such change in the condition of the adjacent property, and its character for use, as leaves no ground for equitable interference, if the discretion of the court is to be governed by the principles I have stated, or the cases which those principles have controlled." And further (at p. 321): " There is, I think, no merit in the respondent's suggestion that the change in the character of the neighborhood is insufficient so long as it does not extend to all the property affected by the agreement. If this assumption is well founded — if the influence of the road is felt only by the portion of land owned by the defendant, it is still apparent that the original design of the parties has been broken up by acts for which neither the defendant nor his grantors are responsible, that the object of the covenant has been, so far as the defendant is concerned, defeated, and that to enforce it would work oppression, and not equity."

In *Schefer* v. *Ball* (53 Misc. 448; affd., 120 App. Div. 880, and

192 N. Y. 589) the trial court said (at p. 456) concerning a restrictive covenant no longer operative by reason of lapse of time and change of locality: " To enforce this covenant so long after its usefulness has disappeared, and to forbid the defendant to make this most valuable use of his property, would be injuring the defendant without conferring any benefit upon the plaintiff. For this reason also the injunction should be refused. *Trustees of Columbia College* v. *Thacher,* 87 N. Y. 311. There should be judgment for the defendant, dismissing plaintiff's complaint, with costs."

In the case at bar almost the entire property in the vicinity of the block upon which the plaintiffs' residence has been built is devoted to business purposes. All that the plaintiffs are seeking to accomplish is for a period of a little over two years to enforce a covenant which can no longer practically benefit them. They contend that the use by defendants of their property for business purposes offends them. They are shocked at seeing people engaged in trade so near their place of residence, and yet they cannot but look about and see the same thing on all sides. Plaintiffs' residence was built in 1922, and at that time they knew that for only six years could they bar the use of the other property in the block for business purposes. Photographs were introduced in evidence showing the fine residence erected by the plaintiffs. Interior views are presented showing handsomely furnished apartments, and yet, if there is any substance to their claim, they are bound to be ruined after a brief period of less than three years. So far from cutting off their light from the rear windows of their residence, the building erected by the defendants is far less objectionable than would be a residence erected thereon which ordinarily would be many more stories in height than the two-story building erected by the Joray Holding Company, Inc. The appellants claim that the view of the defendants' business building from the rear windows of their Seventy-first street residence is offensive. As a matter of fact, owing to the presence of the building on Seventieth street west of the defendants' structure, and which abuts upon the plaintiffs' residence at the rear, the plaintiffs are able to see only a part of the defendants' building. Under the decisions of the courts I think there has been such a radical change in the neighborhood as to require a denial of the drastic relief which the plaintiffs seek. Because of the brief period of two years and ten months, building for business purposes may be withheld, and without taking any steps to restrain the outlay by the defendants of over $40,000, they now, upon what seems to me to be a mere whim, ask that the valuable and expensive building erected by the defendant Joray

Holding Company, Inc., at such substantial outlay be torn down, and that no business erection be made upon the lot until the 1st day of January, 1929. I think the position of the plaintiffs is inequitable and oppressive.

The learned court below found that by their proofs the defendants had established that the plaintiffs had come into court with unclean hands, and that they themselves had openly violated the provisions of the restrictive covenant in both its branches. The restrictive covenant is of two parts. The first part restricts the erection upon any part of the restricted area of any building except a dwelling house for a single family. The second part of the restriction provides that there shall be erected on the premises no building or other structure or any extension thereof or projection therefrom (except partition walls or fences not exceeding twelve feet in height) within ten feet of a vertical plane passing through the centre line of the block between Seventieth and Seventy-first streets. This restriction was manifestly for light and air for a space of twenty feet running easterly and westerly through the restricted area. The evidence shows that at the time the defendant Finch acquired title to the property in question, there had been erected in connection with the building owned by the plaintiffs at the southwest corner of Madison avenue and Seventy-first street at the most southerly end thereof on Madison avenue a wall or extension running along Madison avenue on the line of the front wall of plaintiffs' building sixteen feet in height to the division line between the property of the plaintiffs and that of the defendant Finch. This erection was clearly in violation of said restrictive covenant, and of itself was sufficient to close the doors of equity upon the plaintiffs. *After the action was commenced* and before the trial, the plaintiffs caused said wall or erection to be torn down to the height of about twelve feet. They insist that a court of equity looks at the property as it was situated at the time of the trial. While this may be the general rule, still I think the defendant Finch was justified in observing the conditions as they existed at the time he purchased the property and at the time the building was erected thereon by his tenant. At that time the plaintiffs had themselves violated the covenant. At the time the action was commenced they were in no position to enforce the same.

But a more serious violation of the restrictive covenant rested in the fact that at the time the property in question was purchased by the defendant Finch, the house owned by the plaintiffs adjacent to said defendant's property to the north and facing on Madison avenue was occupied otherwise than as a dwelling house for a

single family.  As a matter of fact the house in question was occupied by Frederick Tilney, described as an eminent neurologist. The evidence showed that he daily received twenty or more patients, often accompanied by nurses, for treatment at his office in the building.  He displayed in the front window on the first floor his professional sign as a physician.  The evidence was to the effect that the entire ground floor, with the exception of the kitchen, was used by Dr. Tilney for business purposes.  The evidence showed that the second floor was occupied by the doctor and his family as living apartments, while the third floor was occupied by the doctor and two other physicians, Drs. Howe and Riley, who were there independently practicing their profession.  Not only did Dr. Tilney's professional sign appear in one of the front windows of the building, but the professional signs of each of these other doctors also was displayed in other windows upon the ground floor.  The defendant Finch testified that he saw machines through the windows of the building, and it appeared by the evidence that there were in use at least two electrical machines used in the treatment of patients.  None of the three physicians, with the exception of Dr. Tilney, resided upon the premises.  The plaintiffs attempted to show that the two doctors, aside from Dr. Tilney, assisted him in the treatment of patients.  The evidence was that in some instances they did make preliminary examinations of patients coming to Dr. Tilney for treatment, but the evidence further showed that these two doctors also occupied an office by themselves in the building, where they received patients for treatment and from whom they received compensation for their services rendered.  The plaintiffs attempted to prove that the two doctors paid Dr. Tilney no rent, but the contrary conclusively appeared from the testimony of Dr. Tilney that while they paid him no money rent for their room, they did render him assistance in preliminary examination of patients and in consideration thereof were allowed to receive and treat their own patients there, from whom they received compensation and in which Dr. Tilney was in nowise interested.  In the prevailing opinion, in relation to the occupation of the plaintiffs' building by those doctors, it is said: " Dr. Howe and Dr. Riley pay Dr. Tilney no rent and no monetary consideration passes between them."

In relation to such occupancy, Dr. Tilney testified on cross-examination as follows: " Q.  Will you tell in detail what each one of those rooms is used for?  A.  I will.  The first room I use as my consulting room.  The second room is used as an examining room.  The third room is used as an examining room, and the fourth room is used by Dr. Riley and Dr. Howe, and the fifth room

is used as a secretary's room. Q. And how do Dr. Riley and Dr. Howe use their particular room, as an office? A. Yes. Q. Do you employ Dr. Riley and Dr. Howe? A. No, I do not. Q. You do not employ them? A. No. Q. Do they have patients of their own come to see them there? A. Some, yes. Q. And those patients that they have come to see them there pay them for their services, do they not? A. I presume so. Q. But they don't pay you for their services? A. No, they do not pay me. Q. So Dr. Riley and Dr. Howe each have their own clientele of patients? A. Some patients of their own, yes. Q. And they occupy these separate offices in your house that you have told us about? A. I didn't say that. I didn't say they occupied a separate office. Q. What did you say? A. I say they occupy a separate room. Q. And that room you said they used as an office? A. As a consultation room. Q. As a consultation room? A. Yes. Q. And in that room in your house — in that room in your house they see their own patients? A. Yes. Q. And those patients are not your patients? A. Not all of them are mine. Some of them are. * * * Q. How many secretaries have you, doctor? A. I have four. Q. Four secretaries? A. Yes. * * * Q. Does your family occupy any part of the first floor for living? A. No — well, except the kitchen. * * * Q. Does your family occupy any part of the third floor for living purposes? A. None. * * * Q. What consideration do you receive from them [Dr. Howe and Dr. Riley] for the use of that room? The Witness (addressing the Court): Do I need to disclose that? The Court: Not in amount. You may state whether or not you do receive a consideration from them. The Witness: No, I do not receive any money consideration. Q. Well, what do they do in return for the use of that room? The Witness (addressing the Court): Must I answer that? The Court: Yes. The Witness: Dr. Riley and Dr. Howe are both my associates in the college and they do the preliminary examination of patients who come to me. I am unable on account of consultation work to see many of these patients that are then sent to the hospitals for further examination, and they take care of them there and have the privilege of making full charges for their services, and in that way they are compensated for the association in my offices. The Court: So there is no consideration passed between you and them? The Witness: No. * * * Q. You receive pay in that way? A. Yes. Q. Do people come there to your office by appointment? A. They all come by appointment. Q. And do the patients also come to see Dr. Howe and Dr. Riley by appointment? A. Yes, I presume so, those who come to see those doctors."

I think it appears very clearly from the foregoing testimony that the two doctors do, in fact, pay Dr. Tilney for the rent and occupation of their office in the manner testified to by him. So far as the evidence shows these two doctors had no other source of income, except what they received from patients whom they privately treated and from whom they received compensation for such treatment. It is urged that Dr. Tilney was not carrying on a business in the building, but that he was merely a resident there. However this may be, Drs. Howe and Riley received their patients there for treatment, they carried on their business there, neither of them resided in the building, and they had no other offices. While the three doctors may not have been carrying on a " business " as distinguished from practicing their " professions," the question here is whether the plaintiffs were permitting the use of their building for purposes other than " a dwelling house for a single family." The covenant was not against using the property for business, but forbade its use, except as " a dwelling house for a single family." The use of the premises in question by the three doctors certainly violated the covenant. The occupation of the plaintiffs' building for business purposes was open and notorious. It adjoined the residence of the plaintiffs. The plaintiffs could see the doctors' signs displayed in the front windows of the building. They must have known what was transpiring, and, so far as the evidence shows, they received the rent for the building and made no effort whatsoever to stop the violation of the restrictive covenant with reference thereto.

The case of *Barnett* v. *Vaughan Institute* (affd., on opinion of Mr. Justice THOMAS at Special Term, 119 N. Y. Supp. 45; 134 App. Div. 921; affd., by the Court of Appeals, 197 N. Y. 541) defines private house and dwelling. At page 46 Mr. Justice THOMAS wrote: " A ' private house ' is a private dwelling. A dwelling is a ' place or house in which a person lives.' Webster's Dictionary. A private dwelling is a place or house in which a person or family lives in an individual or private state. The words ' dwelling house ' involve the idea of a house, a residence, where persons live in settled abode. A dwelling house is a ' house intended to be occupied as a residence, in distinction from a store, office, or other building.' Webster's Dictionary. A private dwelling house is one intended for private living. In these days of apartments, I am not giving to the words a narrow meaning. *But a house intended for a private residence or home is not intended for a place for the temporary gathering of diseased persons for treatment. If the covenant means that there shall be erected on the premises only buildings intended for a house or private dwelling, it is the merest evasion to*

*defeat the intention by using the structure for what a private dwelling is not used. Then that which was a private dwelling is no longer such. It is not a place where a person or persons reside. \* \* \** The building looks like a private dwelling. It is not one. The plain fact is that a dwelling house is recognized by its appearance and *use.* If it be appointed to a business, it is a dwelling house no longer, save to those ignorant of its use. I would preserve the substance of the covenant and enforce it according to the ordinary intendment of the words used." (Italics are the writer's.)

Reference is made in the prevailing opinion to the fact that there has been no change in the outward appearance of plaintiffs' building at the southwest corner of Seventy-first street and Madison avenue wherein the three doctors are practicing their profession. In the case of *Booth* v. *Knipe* (178 App. Div. 423) Mr. Justice LAUGHLIN, writing for this court, said (at p. 430): " The defendant Knipe used the house as his private residence and for an office and for a limited number of his patients. So far as appears externally, the building is a private residence, and is occupied as such by the defendant Knipe. The only external indication that it is not used exclusively as a private residence is his inconspicuous professional sign."

This court held in that case that the defendant Knipe, who was receiving a limited number of patients, was not violating the covenant restricting the use of the house wherein he resided as a private residence for one family. An appeal to the Court of Appeals resulted in a reversal of this court and an affirmance of the order of the Special Term granting the plaintiff injunctive relief (225 N. Y. 390). In *Booth* v. *Knipe* the lease under which the defendant was occupying the premises was introduced in evidence. It provided that the building was to be occupied " as a sanatorium and not otherwise," and the evidence was such as to indicate that the property had been used as a maternity hospital where two or three patients were received at a time. In the case at bar, not only was the lessee of the premises practicing his profession there, but two other doctors were carrying on their independent practices in the building. Twenty or more patients daily came there for treatment by the various doctors, often accompanied by nurses and friends. I think the evidence in the case at bar shows a far greater violation of the covenant than that of the defendant in *Booth* v. *Knipe,* where the Court of Appeals said (at p. 397): " By no stretch of language can we say that this is equivalent to use ' as a private residence for one family ' (*Smith* v. *Graham,* 161 App. Div. 803; affd., 217 N. Y. 655; *Barnett* v. *Vaughan Institute,* 134 App. Div. 921; 197 N. Y. 541)."

The law is too well settled to require the citation of many authorities that one seeking relief in a court of equity must come into court with clean hands, and that one may not insist upon enforcing a covenant which he himself has broken. (*Wallack Construction Co. v. Smalwich Realty Corp.*, 201 App. Div. 133; *Schermerhorn v. Bedell*, 163 id. 445; affd., 221 N. Y. 536.) In the latter case the Appellate Division, Fourth Department, said (at p. 451): "In a court of equity the plaintiffs would be estopped by their own acts and encroachments from claiming that the original twenty-two foot restriction now applies to the defendant's lot. Even if notice of the restriction could be implied from the facts the court would be reluctant to grant the relief asked at the insistence of plaintiffs, who have themselves violated and ignored the covenants which they now seek to enforce against the defendant." (See, also, *Coates v. Cullingford*, 147 App. Div. 39.)

I think the plaintiffs have failed to show grounds for granting equitable relief in this case. The testimony conclusively shows that the plaintiffs not only have not been damaged by the erection of the defendant's building, but by the erection of a dwelling house on the property of the defendant the plaintiffs would be injured to a far greater degree. On the other hand, it appears that if the defendants are compelled to tear down their building to satisfy the caprice of the plaintiffs for a very limited period, they would suffer a substantial monetary damage. If this covenant had a long period to run, and if, in fact, the plaintiffs suffered any damages whatever, I would be inclined to favor the granting of the mandatory injunction asked; but here no damages have been suffered, and the time when the plaintiffs may object is brief. At the trial the court asked counsel for the plaintiffs whether the plaintiffs asked damages, to which plaintiffs' counsel replied: "We do not stand on money damages here." It seems to me the whole situation is well summed up in the opinion of Judge CHASE in *Bull v. Burton* (227 N. Y. 101). At page 112 Judge CHASE, referring to various authorities, said:

"They do hold that a court of equity should not do inequity, and that if the granting of an injunction to enforce restrictive covenants will result in inequity it will be denied, and leave the plaintiff to his remedy at law. That is the rule fully established by *Trustees of Columbia College v. Thacher* (*supra*). The court speaking by Judge DANFORTH, referring to a court of equity, say: 'It gives or withholds such decree according to its discretion in view of the circumstances of the case and the plaintiff's prayer for relief is not answered, where, under those circumstances, the relief he seeks would be inequitable.' (p. 317.)

"The court further say: 'In the case before us the plaintiffs rely upon no circumstance of equity but put their claim to relief upon the covenant and the violation of its conditions by the defendant. *They have established, by their complaint and proof, a clear legal cause of action. If damages have been sustained, they must in any proper action, be allowed.* But on the other hand the defendant has exhibited such change in the condition of the adjacent property and its character for use as leaves no ground for equitable interference, if the discretion of the court is to be governed by the principles I have stated, or the cases which those principles have controlled.' (p. 319.)

"The *McClure* case was an action to restrain the defendant from erecting an apartment house in alleged violation of a restrictive covenant. The Special Term dismissed the complaint. The judgment of the Special Term was reversed in the Appellate Division. This court modified the judgment of the Special Term so as 'to declare that it is without prejudice to an action at law,' and as thus modified affirmed it.

"The *Batchelor* case [*Batchelor* v. *Hinkle*, 210 N. Y. 243] was brought to enforce a restrictive covenant. After the making of the covenant the buildings in the neighborhood were entirely changed in character and the court held that the covenant should not be enforced in equity but that the plaintiff should be remitted to an action at law for her damages.

"The *Jackson* case [*Jackson* v. *Stevenson*, 156 Mass. 496] was a bill in equity brought to enforce the restrictions in a deed but on account of changed circumstances the court refused to grant the injunction but the bill was retained for the purpose of assessing the plaintiff's damages as in an action at law.

"In the *Deeves* case [*Deeves* v. *Constable*, 87 App. Div. 352] it is held that the easement therein mentioned had been extinguished.

"The *Roth, Schwarz* and *Schefer* cases [*Roth* v. *Jung*, 79 App. Div. 1; *Schwarz* v. *Duhne*, 118 id. 105; *Schefer* v. *Ball*, 120 id. 880; affd., 192 N. Y. 589] were each to obtain injunctive relief against restrictive covenants and the rule stated in the *Columbia College* case was restated and enforced."

I do not think this case is one where in justice and equity, in view of the absence of any substantial benefit to the plaintiffs and in view of plaintiffs' violations of the covenant themselves, and where it appears that enforcement of the covenant would work severe hardship upon the defendants without corresponding advantage to the plaintiffs, the court should enforce by its peculiar mandate the restrictive covenant in question.

This court is about to grant the plaintiffs the mandatory injunc-

tion they ask. What will be the net result? Simply this: The defendant Finch will be deprived of a profitable use of his property acquired in the belief that it was no longer burdened by the restriction — a belief justified by changed conditions and by the fact that the plaintiffs were themselves ignoring the restriction in both of its branches, and were themselves openly violating it; the defendants will be compelled to tear down, wreck and remove a substantial business structure which they have erected upon the lot at a cost of between $43,000 and $44,000, and which will mean a financial loss to the defendant Finch, who had agreed to indemnify his codefendant, of more than the cost of the building; the defendant may, after two years and ten months, replace the building which the plaintiffs have compelled him to remove or erect one that may be far more objectionable to the plaintiffs, but which they will be powerless to prevent, at a further cost of as much or more than that required to erect the building removed, and which has in no way damaged the plaintiffs — all this without the slightest benefit to the plaintiffs beyond the gratification of the merest whim.

There is evidence showing that conferences between the parties were held and efforts made " to arrive at an amicable settlement " of this controversy. As to what " settlement " was suggested or would be " amicable," we can only surmise, but sufficient appears to give birth to the suspicion that the plaintiffs are now forcing the issue because of their disappointment in not obtaining from the defendant Finch a settlement, monetary or otherwise, for damages which they have not, in fact, suffered. It is suggested in the prevailing opinion that the action of the defendants in the erection of their building was unduly precipitate, and that the defendants had attempted to gain an advantage by erecting their building before the plaintiffs could restrain them. I think the evidence indicates quite the contrary. The defendants' building was erected during the summer of 1924, and the defendants' witness Scheinberg, the head of the defendant Joray Holding Company, Inc., testified that the first intimation that there was to be any lawsuit was in the latter part of September, after the building was up a story and a half. The conference looking to " an amicable settlement " was after the defendant Finch had returned from Europe on September thirteenth. The summons was not issued until September 23, 1924, and the complaint was verified on that date. The action was not commenced until after the defendants' building was practically completed, and, as before stated, there was no attempt on the part of the plaintiffs to obtain a restraining order *pendente lite.* Under the circumstances, I do not think the action of the

defendants was unduly precipitate, or that the defendants showed any disposition to " race with the court's process."

The judgment appealed from was right, and should be affirmed, with costs.

Judgment reversed, with costs, and judgment directed in favor of plaintiffs for the relief demanded in the complaint, with costs. Settle order containing findings on notice.